**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

KAREN M. KIRT,

        Plaintiff,

vs.

FASHION BUG #3253, INC., an Iowa
corporation,

        Defendant.

No. C 05-4142-MWB

**MEMORANDUM OPINION AND**
**ORDER REGARDING**
**DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A.* *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 7
    *B.* *Kirt's § 1981 Race Discrimination Claim* . . . . . . . . . . . . . . . . . . 10
        *1.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 10
            *a.* *Fashion Bug's initial argument* . . . . . . . . . . . . . . . 10
            *b.* *Kirt's response* . . . . . . . . . . . . . . . . . . . . . . . . 11
            *c.* *Fashion Bug's reply* . . . . . . . . . . . . . . . . . . . . . 11
        *2.* *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            *a.* *The statute* . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            *b.* *Requirements for proof of a claim* . . . . . . . . . . . . . 14
        *3.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            *a.* *Membership in a racial minority* . . . . . . . . . . . . . . 18
            *b.* *Intentional discrimination* . . . . . . . . . . . . . . . . . . 18
            *c.* *Interference with a right to contract* . . . . . . . . . . . . 20
    *C.* *Kirt's Iowa Civil Rights Claim* . . . . . . . . . . . . . . . . . . . . . . . 31

|  | 1. | *Arguments of the parties* | . . . . . . . . . . . . . . . . . . . . . . . | 31 |
|  |  | a. | *Fashion Bug's initial argument* . . . . . . . . . . . . . . . | 31 |
|  |  | b. | *Kirt's response* . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | c. | *Fashion Bug's reply* . . . . . . . . . . . . . . . . . . . . . | 32 |
|  | 2. | *Applicable law* | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | a. | *The statute* . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | b. | *Requirements for proof of a claim* . . . . . . . . . . . . . | 34 |
|  |  |  | i. | *Possible formulations of the prima facie case* . . | 34 |
|  |  |  | ii. | *The proper formulation* . . . . . . . . . . . . . . . | 37 |
|  | 3. | *Analysis* | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
|  |  | a. | *Kirt's prima facie case* . . . . . . . . . . . . . . . . . . . | 42 |
|  |  |  | i. | *Membership in a protected class* . . . . . . . . . . | 42 |
|  |  |  | ii. | *Attempt to enjoy accommodations* . . . . . . . . . | 42 |
|  |  |  | iii. | *Refusal or denial of accommodations or other discrimination* . . . . . . . . . . . . . . . . . . . . . | 43 |
|  |  | b. | *Fashion Bug's legitimate reasons* . . . . . . . . . . . . . | 48 |
|  |  | c. | *Kirt's showing of pretext and discrimination* . . . . . . . | 48 |
| **III.** | **CONCLUSION** | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |

An African-American customer has sued a retail store for race discrimination pursuant to the "right-to-contract" provisions of 42 U.S.C. § 1981 and the "public accommodations" provisions of the Iowa Civil Rights Act (ICRA), IOWA CODE § 216.7. The viability of the customer's federal claim turns on whether there was actually any "interference" with the her "right to contract" because of her race. Similarly, the viability of the customer's state-law claim turns on whether there was actually any "refusal" or "denial" of her right to "accommodations, advantages, facilities, services, and privileges" or proof that she was "otherwise discriminated against" in the furnishing of such accommodations because of her race. In a motion for summary judgment, the store

2

contends that the customer cannot establish a *prima facie* case of race discrimination under either federal or state law, because after a store employee allegedly made racially charged accusations of shoplifting, the store manager invited the customer to continue shopping. The customer, however, contends that there are sufficient genuine issues of material fact concerning racial animus and interference with her rights for her claims to go to a jury.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendant's motion for summary judgment. The court will then discuss specific factual disputes, and the extent to which they may be material, in the context of pertinent portions of its legal analysis.

Plaintiff Karen M. Kirt is an African-American woman. Defendant Fashion Bug #3253, Inc., (Fashion Bug) is a retail women's clothing store in Sioux City, Iowa. The parties agree that, on October 19, 2004, Kirt, accompanied by her young daughter, made one of only a handful of visits that she had ever made to Fashion Bug. Kirt does not remember being greeted by any store employee as she entered the store. Kirt contends that she did not stay in the store very long, probably only about fifteen minutes, because her daughter was running around. Kirt decided to leave the store without making any purchases and to return the next day without her daughter. Fashion Bug contends that a store employee, Melissa ("Missy") Anderson, recalls that Kirt was carrying a large, unzipped purse that looked empty and that, after Kirt left, Anderson found an empty hanger and a broken security sensor. Fashion Bug contends that Anderson then called the

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 3 of 50

store manager, Margaret ("Maggie") Beaudette, to report the incident. Kirt denies Anderson's version of events as "self-serving."

The parties agree that Kirt returned to Fashion Bug the next evening, October 20, 2004, accompanied by her boyfriend, now husband, Israel. Kirt contends that she returned to the store to purchase pink jeans, which she had been led to believe by a friend could be found at Fashion Bug. Kirt contends that, when she entered the store, Beaudette approached her and said, "Hi," to which Kirt and Israel responded, "Hi." Anderson stated in her deposition that she was leaving for lunch as Kirt came in, but recognized Kirt as the person who had been acting suspiciously the day before, so Anderson remained in the store and notified Beaudette that she had recognized Kirt.

Fashion Bug admits, for purposes of this motion, Kirt's version of what then occurred. Kirt contends that Anderson approached Kirt and asked if she could help her, what she needed, and if she and her companion were looking for something in particular, but Kirt told Anderson that the other woman (Beaudette) had already greeted her and that she did not need any help. Kirt contends that, thereafter, Anderson followed wherever Kirt and Israel walked in the store. At some point—neither party's statement of facts makes clear what was the catalyst—Anderson purportedly said, "I get sick and tired of you people," "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags," screamed at Kirt, and told her that if she did not leave the store, Anderson would call the police. Beaudette approached at some point in the course of this incident to try to get Anderson to stop, apologized for Anderson's behavior, and asked Kirt to "finish [her] shopping." Kirt admits that Beaudette was very pleasant (in cited portions of her deposition, Kirt described Beaudette as "really nice"), that Beaudette provided Kirt with a contact telephone number to advise Fashion Bug representatives of her complaints, and that Beaudette gave her Anderson's

4

name. Kirt nevertheless left the store, went home, and started crying. Kirt later contacted a representative of Fashion Bug, provided information about what had happened on October 20, 2004, and was assured that the representative would look into it. Kirt has never returned to the Fashion Bug store.

Fashion Bug contends that it is store policy to greet customers promptly and to watch them as they move about the store to avoid or minimize theft, which is a large problem in the retail industry. Kirt denies the existence of such a policy, because Kirt contends that no such policy has been produced in this litigation, and the court notes that no such policy appears in either party's appendix.

## B. Procedural Background

Kirt filed her Complaint And Jury Demand (docket no. 1) in this action on November 29, 2005, naming Fashion Bug as the sole defendant on a theory of *respondeat superior* liability for the conduct of the store clerk, Missy Anderson, and asserting that such conduct constituted race discrimination in violation of both 42 U.S.C. § 1981 (**Count I**) and IOWA CODE § 216.7 (**Count II**).[1] Kirt seeks declaratory relief, compensatory damages including damages for emotional distress, punitive damages, costs, attorneys fees, and such other relief as she may be entitled to obtain. Fashion Bug filed its Answer And Jury Demand (docket no. 4) on January 11, 2006, denying Kirt's claims and alleging, as an affirmative defense, that Kirt's Complaint fails to state claims upon which relief can be granted. Trial in this matter was originally set for May 21, 2007, but

---

[1]Kirt's state-law claim is improperly designated another "**Count I**" in her Complaint.

5

was subsequently rescheduled to begin on October 9, 2007, on Kirt's unresisted motion for a continuance.

On December 21, 2006, Fashion Bug filed the Motion For Summary Judgment (docket no. 10) now before the court. Kirt filed her Resistance (docket no. 11) on January 16, 2007, and Fashion Bug filed its Reply (docket no. 13) in further support of its motion on January 23, 2007.[2] By order dated February 6, 2007 (docket no. 15), the court set oral arguments on Fashion Bug's Motion For Summary Judgment for February 28, 2007. Owing to a conflict in the court's schedule, however, the oral arguments were rescheduled for March 15, 2007.

At the oral arguments, plaintiff Karen Kirt was represented by Stanley E. Munger of Munger, Reinschmidt & Denne, L.L.P., in Sioux City, Iowa. Defendant Fashion Bug was represented by Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra, Prahl, L.L.P., in Sioux City, Iowa. The court was impressed with the quality of the briefs in this matter and found the spirited, well-prepared oral arguments to be very enlightening. This matter is now fully submitted.

---

[2]On January 23, 2007, Fashion Bug also filed a Motion To Strike (docket no. 12) seeking an order striking certain of Kirt's responses to Fashion Bug's statements of undisputed facts, but the court struck that motion by order dated January 26, 2007 (docket no. 14). The court found that such a motion was totally unnecessary, because a local rule, N.D. IA. L.R. 56.1(b)(2), already provides an adequate sanction for a party's failure to respond properly to an opposing party's statement of undisputed facts by deeming the inadequate responses to be admissions of the pertinent facts. *See* Order (docket no. 14).

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

7

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return

8

a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party in such cases is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Although the Eighth Circuit Court of Appeals has not given the same caution about summary judgment on § 1981 right-to-contract discrimination cases, such cases—and "public accommodation" claims pursuant to IOWA CODE § 216.7—likewise depend upon inferences of discrimination and, when based on circumstantial evidence, also employ a similar burden-shifting analysis to sift the inferences. *See, e.g., Williams v. Lindenwood Univ.*, 288 F.3d 349, 355 (8th Cir. 2002) (a § 1981 right-to-contract discrimination claim is based on inferences to be drawn from circumstantial evidence and is, therefore, governed by the familiar burden-shifting analysis); *see also Kiray v. Hy-Vee, Inc.*, 716 N.W.2d at 193, 202 (Iowa Ct. App. 2006) (a claim pursuant to IOWA CODE § 216.7 based on circumstantial evidence is also analyzed pursuant to the burden-shifting analysis). Therefore, this court believes that it should be equally cautious about granting summary judgment in a right-to-contract race discrimination case under § 1981 or a "public accommodation" claim pursuant to IOWA CODE § 216.7.

9

The court will apply these standards to Fashion Bug's Motion for Summary Judgment on each of Kirt's race discrimination claims.

## B. Kirt's § 1981 Race Discrimination Claim

Fashion Bug first seeks summary judgment on Kirt's § 1981 race discrimination claim in **Count I** of her Complaint. Kirt resists summary judgment on this claim. The court's analysis of whether or not summary judgment is appropriate on this claim begins with a summary of the parties' arguments.

### 1. Arguments of the parties

#### a. Fashion Bug's initial argument

In support of its motion for summary judgment on Kirt's § 1981 claim, Fashion Bug argues that § 1981 was not intended to be a general civility code; instead, a claimant under § 1981 must prove a violation of her right to make and enforce contracts because of her race. Fashion Bug argues that actual loss of a contract interest, not just the mere possibility of loss of future contract opportunities, is required. Thus, Fashion Bug argues that Kirt must offer evidence of some tangible attempt to contract that was thwarted by the defendant, but she cannot do so. Here, even assuming that discriminatory conduct occurred, which Fashion Bug denies, Fashion Bug argues that Kirt was not prevented from enjoying the benefits of shopping and possibly making a purchase at the store, because she was invited to continue shopping by the manager, Kirt knew that she could ask the manager for help if she wanted it, and Kirt admits that the manager gave her every indication that she would gladly sell her anything that she wanted to buy. In support of its argument, Fashion Bug relies primarily on *Bagley v. Ameritech Corp.*, 220 F.3d 518, 521-22 (7th Cir. 2000).

10

### b.    Kirt's response

In her resistance, however, Kirt contends that she can establish each element of her *prima facie* case of race discrimination under § 1981 or can, at least, generate genuine issues of material fact as to each element.  Kirt contends that Fashion Bug has conceded the first element of her *prima facie* case, that she is a member of a protected racial minority, African-American.  She contends that the second element, intent to discriminate, is shown by Anderson's comments, which reasonably suggest that the "you people" disparaged in those comments were African-Americans.  On the final element, which is the focus of Fashion Bug's motion, Kirt contends that she has shown that she had more than a "general interest" in the merchandise of the store, because the only reason that she entered the store was to purchase pink jeans or slacks, and she was shopping for that particular item.  She contends, further, that the record shows that she was deterred from making such a purchase by Anderson's discriminatory conduct.  She argues that it is contrary to the language and purpose of § 1981 to require a claimant to endure whatever discrimination she is being subjected to long enough to attempt to make a purchase.  Here, she contends that she was too upset to continue shopping and was forced to leave the store without making a purchase because of the racially discriminatory conduct by Anderson, notwithstanding Beaudette's invitation to continue shopping.  She contends that it is inconceivable that the law would leave her with no recourse in these circumstances.

### c.    Fashion Bug's reply

In reply, Fashion Bug reiterates that § 1981 is not a general civility code and does not provide a general cause of action for race discrimination, but instead requires a showing that a contractual relationship was actually thwarted.  Fashion Bug argues that, in this case, Kirt cannot generate a genuine issue of material fact on that requirement. Fashion Bug points out that Kirt never told anyone at the store that she was looking for

11

pink jeans or any other specific item and that Kirt has admitted that, even after Anderson's tirade, she knew that she could ask Beaudette for help in finding the item she was supposedly seeking. Changing gears, Fashion Bug also argues that any discriminatory comments were made by a subordinate, not by the manager of the store, and, thus, Kirt has failed to generate a fact issue on any discriminatory intent by Fashion Bug, let alone on any attempt to complete a contractual relationship.

### 2. *Applicable law*

#### a. *The statute*

Section 1981 of Title 42 of the United States Code, upon which Kirt's federal claim is based, provides for equal rights under the law, as follows:

**(a) Statement of equal rights**

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

12

### (c) Protection against impairment

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (emphasis added). "Section 1981 does not provide a general cause of action for race discrimination if in fact it occurred." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001), *cert. denied*, 535 U.S. 1017 (2002). Rather, the plaintiff must point to violation of some specific right protected by § 1981. *See Williams v. Lindenwood Univ.*, 288 F.3d 349, 355 (8th Cir. 2002) (an element of the plaintiff's *prima facie* case is a showing that "the discrimination concerned an area enumerated by the statute"); *Youngblood*, 266 F.3d at 855 (the plaintiff was required to point to interference with some contractual relationship to bring a claim under the right-to-contract provisions of § 1981).

In pertinent part, "[t]he purpose of 42 U.S.C. § 1981 is to prohibit discrimination in the 'performance, modification and termination of contracts' and to protect 'the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.'" *Williams*, 288 F.3d at 355; *Youngblood*, 266 F.3d at 854 ("Section 1981 provides that all persons shall have the same right to 'make and enforce contracts.' *See* 42 U.S.C. § 1981(a). In 1991, Congress expanded the scope of Section 1981 to include the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.' *See* 42 U.S.C. § 1981(b)."). A claim based on these provisions of § 1981 is a "right-to-contract" claim. *See, e.g., See, e.g., Bediako v. Stein Mart, Inc.*, 354 F.3d

835, 839 (8th Cir. 2004); *Youngblood*, 266 F.3d at 854 (describing such a claim as a "right to contract" claim).[3]

### b.    Requirements for proof of a claim

The Eighth Circuit Court of Appeals explained the applicable analysis for such a "right-to-contract" claim under § 1981, as follows:

> Because plaintiff's discrimination claim is "based on inferences to be drawn from circumstantial evidence, it is governed by the familiar burden-shifting analysis." *Carter v. St. Louis Univ.*, 167 F.3d 398, 401 (8th Cir. 1999) (*Carter*). To establish a *prima facie* claim of racial discrimination under 42 U.S.C. § 1981, the plaintiff must show that (1) he is a member of a racial minority, (2) the defendant intended to discriminate against him on the basis of race, and (3) the discrimination concerned an area enumerated by the statute. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). Once the plaintiff establishes a *prima facie* case of racial discrimination, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions to rebut the presumption of discrimination. *See Carter*, 167 F.3d at 401. Then, the plaintiff must demonstrate that the defendant's proffered reason was a pretext for unlawful discrimination. *See id*. The "ultimate question of law [is] whether the evidence is sufficient to create a genuine issue of fact as to whether the defendant intentionally discriminated against the plaintiff." *Id., citing Rothmeier v.*

---

[3] Section 1981(a) also gives rise to a "full-and-equal-benefit" claim, pursuant to the provision establishing the right to "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *See, e.g., Bediako*, 354 F.3d at 839; *see also Adams v. Boy Scouts of America-Chickasaw Council*, 271 F.3d 769, 777 (8th Cir. 2001) (highlighting the distinctions between right-to-contract and full-and-equal benefit claims under § 1981, including that the full-and-equal-benefit claim requires state action). Kirt does not assert such a claim, nor could she, because there is no allegation that Fashion Bug was a state actor. *Adams*, 271 F.3d at 777.

14

> *Investment Advisers, Inc.,* 85 F.3d 1328, 1336-37 (8th Cir. 1996).

*Williams*, 288 F.3d at 355; *accord Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (stating essentially the same elements of a *prima facie* case, but framing the third element as "discrimination interfering with a protected activity (i.e., the making and enforcement of contracts)"); *Bediako*, 354 F.3d at 839 (stating essentially the same elements of the *prima facie* case). The court will assess the sufficiency of Kirt's *prima facie* case on her § 1981 claim, which is all that Fashion Bug properly challenged concerning that claim in the summary judgment motion now before the court.[4]

_____

[4] The court notes that Kirt has expressly premised her claims on *respondeat superior* liability of Fashion Bug for allegedly racially discriminatory conduct by Anderson, a clerk in the store. The court notes, further, that Fashion Bug suggested that it could not properly be held liable for any discriminatory conduct of Anderson, and it had not, itself, intentionally discriminated against Kirt, which appeared to the court to be a challenge to *respondeat superior* liability. At the oral arguments on Fashion Bug's motion for summary judgment, however, Fashion Bug's counsel asserted that Fashion Bug was not directly challenging *respondeat superior* liability and had referred to a distinction between the conduct of Fashion Bug and the conduct of its employee, Missy Anderson, only to suggest that the store manager, as the representative of the company, had intervened to end any inappropriate conduct. Fashion Bug contended that any reference to *respondeat superior* liability in its briefing was only inferential and without citation to any authority. The court agrees that Fashion Bug did not expressly challenge *respondeat superior* liability or cite authority in support of such an argument, but the court nevertheless finds that it is appropriate to contemplate, at least briefly, whether *respondeat superior* liability is available under § 1981.

The Eighth Circuit Court of Appeals has questioned whether an employer may be held liable under § 1981 for allegedly discriminatory actions of an employee, such as a sales clerk, under a theory of *respondeat superior*, because the statute "requires a showing of intentional discrimination, which is seemingly incompatible with respondeat superior principles." *Daniels*, 373 F.3d at 888 n.4. The court did not resolve that question in the case in which the court had raised it, however, because the parties had neither raised nor

(continued…)

15

(...continued)
briefed the issue. *Id.*

Here, the court certainly read Fashion Bug's Reply to raise the issue, at least inferentially, because Fashion Bug contended that it had not intentionally discriminated against Kirt, even if Anderson had. Raising a new issue in a reply brief, however, generally does not require the court to consider that issue. As this court has explained,

> Ordinarily, inclusion of a new argument in a reply brief is improper as a matter of motion practice in this court, *see* N.D. Ia. L.R. 7.1(g); *Lorenzen v. GKN Armstrong Wheels, Inc.,* 345 F. Supp. 2d 977, 992 n. 4 (N.D. Iowa 2004); *Baker v. John Morrell & Co.,* 263 F. Supp. 2d 1161, 1169 n. 1 (N.D. Iowa 2003), and, indeed, in this circuit. *See Republican Party of Minn. v. Kelly,* 247 F.3d 854, 881 (8th Cir. 2001) ("It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," citing *United States v. Vincent,* 167 F.3d 428, 432 (8th Cir.), *cert. denied,* 528 U.S. 848, 120 S. Ct. 124, 145 L. Ed. 2d 105 (1999); *South Dakota Mining Ass'n v. Lawrence County,* 155 F.3d 1005, 1011 (8th Cir. 1998); *United States v. Davis,* 52 F.3d 781, 783 (8th Cir. 1995); *French v. Beard,* 993 F.2d 160, 161 (8th Cir. 1993), *cert. denied,* 510 U.S. 1051, 114 S. Ct. 706, 126 L. Ed. 2d 672 (1994)); *accord Barham v. Reliance Standard Life Ins. Co.,* 441 F.3d 581, 584 (8th Cir. 2006) ("As a general rule, we will not consider arguments raised for the first time in a reply brief."). Therefore, the court need not consider [such a] "new" . . . argument here.

*Torgeson v. Unum Life Ins. Co. of Am.,* ___ F. Supp. 2d ___, ___, 2006 WL 3717380, *20 (N.D. Iowa Dec. 6, 2006). This court has recognized that it may nevertheless choose to consider an argument raised for the first time in a reply where, for example, "the belated argument supplements an argument raised in a party's initial brief, where the opposing party was obviously prepared for the untimely argument, or where the belated argument is without merit." *Id.* (internal citations omitted).

The rule, not the exceptions, applies here. Fashion Bug's belated contention that it had not intentionally discriminated against Kirt, even if Anderson had, did not

(continued...)

### 3.    *Analysis*

Because Fashion Bug bases its summary judgment motion only on the sufficiency of Kirt's *prima facie* case, the court will focus its analysis on this first part of the burden-shifting analysis of Kirt's § 1981 claim.  *See Williams*, 288 F.3d at 355 (noting that the plaintiff's *prima facie* case is the first step in the burden-shifting analysis of a § 1981 claim).  The court will consider the elements of Kirt's *prima facie* case in turn.

---

[4](…continued)
supplement any prior argument.  *See id.* (citing supplementation of a prior argument as one exception).  Rather, that argument was an entirely new challenge to the second element of Kirt's *prima facie* case, where Fashion Bug had previously contended only that Anderson's conduct did not constitute intentional discrimination and that, even if Anderson's conduct constituted intentional discrimination, it had not interfered with Kirt's right to contract. Thus, there was no hint prior to Fashion Bug's Reply that Fashion Bug was arguing that it could not be liable on a *respondeat superior* theory for Anderson's conduct, so that Fashion Bug's argument in its Reply cannot supplement such an argument.  There is also no hint in Kirt's brief that she was prepared for the contentions that Fashion Bug, as opposed to Anderson, had not acted with discriminatory intent and that Fashion Bug could not be held liable on a *respondeat superior* theory.  *See id.* (citing the opposing party's obvious preparation for the argument as another exception).  An argument that *respondeat superior* liability is not available is not clearly without merit, either,  *see id.* (citing an argument without merit as another example of a "new" argument in a reply that the court can choose to address), in light of the question raised by the Eighth Circuit Court of Appeals in *Daniels*, 373 F.3d at 888 n.4, about the availability of *respondeat superior* liability for a § 1981 violation.  Therefore, the court finds that, if Fashion Bug intended to assert that a § 1981 right-to-contract claim cannot be premised on *respondeat superior* liability, such an argument is not properly before the court, where that contention was only belatedly raised in Fashion Bug's Reply, and the court declines to consider that argument at this time.  *Torgeson*, ___ F. Supp. 2d at ___, 2006 WL 3717380 at *20.

17

### a.    Membership in a racial minority

For the sake of completeness, there is no dispute that Kirt satisfies the first element of her *prima facie* case, because she is an African-American female. *Id.* (the first element of a *prima facie* case under § 1981 is that the plaintiff was a member of a racial minority). Thus, the court will pass quickly on to disputed elements.

### b.    Intentional discrimination

The second element of Kirt's *prima facie* case, discriminatory intent, *see id.*, is in dispute, because Fashion Bug contends that Anderson's comments, on which Kirt's claim is based, do not give rise to an inference of race discrimination, because the "you people" to whom Anderson referred were Kirt and Israel, not African-Americans generally. Fashion Bug also contends that Anderson's comments referred specifically to Kirt's prior visit to the store after which Anderson had found what she thought was evidence of shoplifting. Indeed, at the oral arguments, Fashion Bug contended that no reasonable person could find otherwise and that Anderson's explanation of her comments is unrebutted, so that there is no evidence to generate a genuine issue of material fact as to any other meaning. Fashion Bug suggests that Kirt relies only on speculation for different inferences.

Fashion Bug is correct that a plaintiff must satisfy the second element with evidence, not merely the plaintiff's own speculation. *Daniels*, 373 F.3d at 887-88 (a black customer's *prima facie* case under § 1981 failed, because she relied only on her own speculation that the defendant store had declined her check in the morning because of her race rather than because of a computer malfunction, where the store had accepted her check in the afternoon, and also relied only on speculation that she was not given a discount offered to white customers where she had not shown that the items that she was purchasing were subject to a discounted sales price). In this case, however, the court finds

18

that there is considerably more than mere speculation on Kirt's part to support her contention that Anderson's comments suggest a racially discriminatory animus.

First, as Kirt points out, a reasonable jury could conclude that the "you people" to whom Anderson referred could not have been Kirt and Israel, because Israel had never been in Fashion Bug before and Kirt's prior visit to the store had been in the company of her young daughter. Second, Anderson's comments—including "I get sick and tired of you people," and "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags"—reasonably suggest that the "you people" in question are members of some group of people who came in with sufficient frequency for Anderson to be "tired" of their behavior and for Anderson to find evidence of shoplifting "every time" such people came in. One class of people to whom Kirt and Israel belong is African-Americans. Thus, in the light most favorable to Kirt, and giving Kirt all reasonable inferences from the record, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts), a reasonable jury could find that Anderson's comments, as recounted by Kirt and not disputed by Fashion Bug for present purposes, directed at two African-Americans, suggest a discriminatory intent to accuse African-Americans generally of tending to engage in or invariably engaging in shoplifting and tending to make or invariably making messes in the store. A reasonable jury would certainly be under no obligation to accept as true Anderson's explanation of her comments, in light of other evidence in the record of the circumstances in which those comments were made. Indeed, a reasonable jury could find that Fashion Bug's strained interpretation of the comments as innocuous results from disingenuousness or sophistry and, as such, is a pretext for discriminatory comments.

19

Thus, Fashion Bug is not entitled to summary judgment on this claim on the insufficiency of evidence of the second element of Kirt's *prima facie* case.

### c.    *Interference with a right to contract*

As to the third element of Kirt's *prima facie* case of a § 1981 violation, interference with the right to make and enforce contracts protected by § 1981, *see Daniels*, 373 F.3d at 887 (so characterizing the third element); *cf. Williams*, 288 F.3d at 355 (stating the third element as evidence that the discrimination concerned an area enumerated by the statute), it is clear that the right to make and enforce contracts under § 1981 includes the right to purchase goods. *Id.* ("Sections 1981 and 1982 protect citizens' rights to make and enforce contracts and purchase both personal and real property without any impairment due to private or public racial discrimination."). The Eighth Circuit Court of Appeals has addressed § 1981 claims by customers of retail establishments on various occasions and has, for example, recognized that "no contractual relationship remains" once a purchase is completed, so that there can be no interference with a contractual relationship where the challenged conduct occurred *after* a purchase. *See Youngblood*, 266 F.3d at 854. The Eighth Circuit Court of Appeals has not, however, addressed whether there has been any interference with a contractual relationship where a purchase of goods was *never attempted*, notwithstanding an invitation to continue shopping after a racially

20

discriminatory incident.[5] That intriguing issue is central to Fashion Bug's motion for summary judgment.

Other Circuit Courts of Appeals to address the claims of customers against retail stores have held that there must be a "nexus" between the asserted discrimination and some contractual right or relationship. *See Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002) (summarizing cases). The nature of the required "nexus" is such that, at least since the 1991 amendment adding subsection (b) to the statute, the statute "extends . . . to situations beyond the four corners of a particular contract" and "applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into, or enjoy the benefits of, a contractual relationship." *Id.* at 100. Nevertheless, the "benchmark," according to these courts, is that, "in order to satisfy the foundational pleading requirements for a suit under section 1981, a retail customer must allege that he was *actually denied* the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a

---

[5]The decisions of the Eighth Circuit Court of Appeals concerning customers' § 1981 discrimination claims against businesses are varied, but do not address the issue directly presented here. *See Bilello v. Kum & Go, L.L.C.*, 374 F.3d 656, 659-61 (8th Cir. 2004) (patron's equal-benefit claim under § 1981 alleging that a convenience store refused to allow patrons access to restroom facilities in stores located in an area of town predominantly populated by African-Americans, but did allow patrons access to restroom facilities in other areas of town); *Daniels*, 373 F.3d at 887-88 (black customer's right-to-contract claim under § 1981 based on store declining her check in the morning, but accepting it in the afternoon, and allegedly denying her discounts offered to white customers); *Bediako*, 354 F.3d at 838-41 (customer's timely equal-benefit claim and untimely right-to-contract claim under § 1981 arising from store's refusal to allow her to reenter the store to look for missing car keys as the store was closing); *Youngblood*, 266 F.3d at 854-55 (customer's right-to-contract and equal-benefit claims under § 1981 arising from an arrest on shoplifting charges, which were later dismissed, and failure to refund the purchase price of confiscated goods that the customer had purchased).

race-based animus." *Id.* at 100-101 (emphasis added) (summarizing cases, including *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751-53 (5th Cir. 2001) (*Dillard Dep't Stores*); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1117-18 (10th Cir. 2001) (*Hampton*), *cert. denied*, 534 U.S. 1131 (2002); *Youngblood*, 266 F.3d at 853-54; *and Morris v. Office Max, Inc.*, 89 F.3d 411, 412-14 (7th Cir. 1996) (*Office Max*), and noting that the court was "not comfortable with all of these outcomes, nor [did it] make a wholesale endorsement of the reasoning employed by these courts.").

As Fashion Bug points out here, some of the courts requiring "actual denial" of the right to contract have held that, where a plaintiff fails to make any actual attempt to make a purchase, despite discriminatory conduct of a store employee, the plaintiff has no § 1981 right-to-contract claim. *See Dillard Dep't Stores*, 277 F.3d at 751-53 (an African-American woman who was accused of shoplifting, arrested, and temporarily banned from returning to a store could not succeed on a § 1981 claim, because she did not "offer evidence of some tangible attempt to contract with [the defendant's store] during the course of the ban, which could give rise to a contractual duty between her and the merchant, and which was in some way thwarted," and thus, her claim of loss of an actual contract interest was "too speculative"); *Hampton*, 247 F.3d at 1117-18 (a woman of African-American descent could not assert a claim pursuant to § 1981, despite being ejected from a store, where she had neither attempted nor planned to make any specific purchase, because "the mere expectation of being treated without discrimination while shopping" will not support a claim; on the other hand, another African-American woman ejected at the same time, who attempted to redeem a coupon that she had received incidental to a prior purchase, had been denied her right to contract); *Office Max*, 89 F.3d at 412-14 (two African-American customers who were hassled by police after an assistant manager became suspicious about them, but whom the police concluded had not engaged in any wrong-doing, had no § 1981

22

claim, because they could not "point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 [where] [t]hey were denied neither admittance nor service, nor were they asked to leave the store"). More specifically still, Fashion Bug contends that, in *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000), in circumstances even more closely resembling those presented in Kirt's case, the Seventh Circuit Court of Appeals rejected a § 1981 right-to-contract claim on the basis that the store was not responsible for terminating a sales transaction, where the plaintiff voluntarily left the store without making a purchase after it was made clear that the store was willing to serve him. The court concludes that the decision in *Bagley* requires careful consideration, because it does appear to be on point here.

In *Bagley*, the court considered the § 1981 claim of a black man who was told by the assistant sales manager of a store that she would not serve him and was then purportedly "given the finger" by the assistant sales manager. *Bagley*, 220 F.3d at 519. The first step in the court's analysis was to hold that the district court had erred to the extent that it had relied on the plaintiff's failure to state specifically that he would like to purchase a product, finding a contrary holding was "both reprehensible and in no way encouraged by our decision in [*Office Max*, 89 F.3d at 411]." *Id.* at 521. Thus, even under *Bagley*, neither Kirt's failure to tell anyone at Fashion Bug that she intended to purchase pink jeans nor her failure to ask to purchase pink jeans is dispositive of her claim.

The second step in the court's analysis in *Bagley* is more critical here, however. In that step, the court considered the plaintiff's contention that he had stated a claim under § 1981 because he had entered the store for the express purpose of buying a phone, but could not complete the transaction when the assistant sales manager said she would not serve him. *Id.* The court rejected that argument, as follows:

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 23 of 50

While we do not fault [the plaintiff] for taking offense at [the assistant manager's] conduct (if, as claimed, it was motivated by racial animus—not "joking around" as she testified), her actions cannot be construed as anything more than a refusal to personally wait on [the plaintiff]. She did not say "We will not serve you," nor did she in any way instruct [another sales clerk] to deny [the plaintiff] service. Rather, it is clear that when she handed [the other sales clerk] the brochure she intended that he would continue to wait on [the plaintiff]. *[The plaintiff] cut off his exchange—and thus the opportunity to buy the phone—by leaving the store.*

Further, even if there were any lingering doubt that [the assistant sales manager's] behavior meant something other than that she would not wait on [the plaintiff] herself, *[the other sales clerk's] offer to help [the plaintiff] make a purchase upon his return later that day definitively establishes that [the store] would have sold [the plaintiff] a phone.*

Since [the store] was not responsible for terminating the transaction, it did not violate §§ 1981 and 1982.

*Bagley*, 220 F.3d at 521-22 (emphasis added).

This court is not convinced that a mere invitation to an offended person to continue shopping after racially discriminatory treatment—however disingenuous or insincere that invitation or whatever conduct belying an intent to serve the person might accompany the invitation—necessarily inoculates a retailer from any and all § 1981 right-to-contract claims. The question under the statute is not merely whether an invitation of some sort to complete a transaction was made, but whether the conduct of the merchant interfered with the customer's right to make or enforce a contract. *See Williams*, 288 F.3d at 355 ("The purpose of 42 U.S.C. § 1981 is to prohibit discrimination in the 'performance, modification and termination of contracts' and to protect 'the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.'"); *Youngblood*, 266 F.3d at 855 (the plaintiff was required to point to interference with some contractual relationship

24

to bring a claim under the right-to-contract provisions of § 1981). Even an "invitation" to enter into a transaction could be accompanied by other conduct or presented in such a manner that the customer's right to contract had been interfered with, because the "invitation" was a sham. *Cf. International Bhd. Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) (in a case involving discriminatory employment practices under Title VII of the Civil Rights Act of 1964 observing, "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

This court, like the court in *Bagley*, also cannot conclude that a plaintiff's failure to request to buy a particular item, whether a phone or pink jeans, despite racially discriminatory conduct, bars that plaintiff's § 1981 right-to-contract claim, because a contrary holding would be "reprehensible" in that it would require exceptional perseverance to enjoy rights supposedly guaranteed to all in the face of discriminatory conduct. *Id.* at 519. Because "§ 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship," *see Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 302 (1994), it follows that racially discriminatory conduct that discourages a customer from even attempting to make a purchase may violate § 1981 if that conduct leads the plaintiff reasonably to believe that any attempt to make a purchase would be futile. *Cf. International Bhd. of Teamsters*, 431 U.S. at 365-66 (a person seeking a job who is unwilling to engage in a futile gesture of applying is no less a victim of discrimination than one who goes through the motions of applying).

In this case, however, there is no evidence giving rise to an inference that Beaudette's invitation to Kirt to continue shopping was a sham or that any attempt by Kirt

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 25 of 50

to purchase an item from Fashion Bug would have been futile, even in light of Anderson's statements. Kirt was justifiably hurt by what she reasonably perceived (and a reasonable juror could perceive) to be reprehensible discriminatory comments by Anderson, but the record shows beyond dispute that Kirt could not have reasonably believed that there was no point in attempting to make a purchase after Beaudette's intervention. *Cf. Bagley*, 220 F.3d at 521 (the court did not fault the plaintiff for taking offense at the allegedly discriminatory conduct by one employee, but nevertheless held that it was clear from the circumstances that the merchant intended that a different employee would continue to serve the plaintiff). The record shows, beyond dispute, that Beaudette did everything she could reasonably have been expected to do to make clear that Kirt could complete any purchase she desired. *Cf. id.* at 522 (even if there was some lingering doubt about discriminatory intent behind the assistant sales manager's conduct, the other sales clerk's offer to help the plaintiff make a purchase upon his return to the store later that day "definitively established that the store would have sold the plaintiff a phone"). There is not the slightest hint that Beaudette's offer to Kirt to continue shopping was in any way disingenuous or belied by other conduct or circumstances. Indeed, on the undisputed record, Beaudette not only stopped Anderson's conduct, invited Kirt to finish her shopping, and offered to help Kirt with whatever she needed, but provided Kirt with all of the information necessary to make a complaint about Anderson's conduct over Beaudette's head to company representatives. Nor is there any dispute that Kirt understood the sincerity of Beaudette's offer, because she believed that Beaudette had been "really nice." Under these undisputed circumstances, it is plain that Kirt terminated the opportunity to enter into a contract or purchase of goods by leaving the store. *Cf. id.* at 521 (the plaintiff had no § 1981 claim, because the plaintiff "cut off his exchange—and thus the opportunity to buy the phone—by leaving the store"). Even though such a reaction to the discriminatory conduct by Anderson was entirely

26

understandable, Kirt's hurt feelings and emotional upset resulting from discriminatory conduct, which prompted her to abandon her shopping, do not establish that the discriminatory conduct actually violated her § 1981 right to contract.

In her brief and at oral arguments, Kirt asserted that denial of her contention that her rights were violated would not be countenanced, for example, in the Tenth Circuit. In support of this contention, she cited *Miales v. McDonald's Restaurants of Colorado, Inc.*, 438 F. Supp. 2d 1297 (D. Colo. 2006), which she argued stands for the proposition that, when a retail store engages in racial discrimination that deters a customer from engaging in a purchase, such discrimination is sufficient to create a cause of action under § 1981, even if the plaintiff does not thereafter attempt to make a purchase and is not specifically denied service. Here, Kirt contends that she should not be left without recourse where she was too upset to continue shopping and left the store without making a purchase as the result of Anderson's discriminatory comments.

The court would not be unsympathetic to this argument, if the "make or enforce contracts" provision of § 1981 could be read so broadly as to prohibit any interference, of any kind, at any point in the "shopping" process as an interference with the right to "make" a contract. The problem with Kirt's contention, however, is that neither the Eighth Circuit Court of Appeals nor any other Circuit Court of Appeals, so far as this court has been able to find, has actually interpreted interference with the right to "make" a contract under § 1981 so broadly.

First, Kirt relies on the prediction of the district court in *Miales* that the Tenth Circuit Court of Appeals would reject the proposition that a § 1981 claim necessarily fails if the plaintiff voluntarily left after being subjected to racial discrimination, but was not specifically denied service. This court finds that prediction suspect. The court in *Miales* characterized the decision of the Tenth Circuit Court of Appeals in *Hampton* as affirming

27

a jury verdict against a retail store, even though the plaintiff left voluntarily without being told that the store would not complete her transaction and while employees who might have assisted her were nearby. *See Miales*, 438 F. Supp. 2d at 1301 (so characterizing *Hampton*, 247 F.3d 1091). In *Hampton*, however, the Tenth Circuit Court of Appeals found that the plaintiff was actually engaged in attempting to redeem a coupon when a security guard interrupted the redemption and accused the plaintiff of shoplifting, and that the jury had reasonably concluded that, had there been no interference, the plaintiff would have received the service of redemption of her coupon. *See Hampton* 247 F.3d at 1106. Thus, this court does not belief that the district court in *Miales* has correctly characterized the holding of the Tenth Circuit Court of Appeals in *Hampton*. Furthermore, the court in *Hampton* stated the applicable rule to be "that a § 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *See id.* at 1104 (quoting *Wesley v. Don Stein Buick*, 42 F. Supp. 2d 1192, 1200 (D. Kan. 1999), in turn citing *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989)). Thus, unlike the court in *Miales*, this court believes that the Tenth Circuit Court of Appeals would, at a minimum, require proof that the plaintiff's right to services was actually interfered with by the allegedly discriminatory conduct, and would not permit a claim where the plaintiff shows only generally that discriminatory conduct occurred and that she declined to proceed further with any transaction.

Second, this court believes that the Eighth Circuit Court of Appeals would require a closer nexus between the allegedly discriminatory conduct and the interference with a customer's right to "make and enforce contracts" than Kirt has shown. The Eighth Circuit Court of Appeals has concluded that § 1981 does not provide a "general cause of action for race discrimination if it in fact occurred," and has, instead, read the statute to require

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 28 of 50

proof of interference with "some contractual relationship." *Youngblood*, 266 F.3d at 855 ("Section 1981 does not provide a general cause of action for race discrimination if in fact it occurred"; rather, the plaintiff must point to interference with "some contractual relationship" to bring a claim under § 1981). The Eighth Circuit Court of Appeals suggested that even proof that the plaintiff was "blatantly discriminated against" would not be sufficient in the absence of proof that the discriminatory conduct actually interfered with a contractual right, because the statute provides for a cause of action in contract, not in tort. *Id.* Here, there is no genuine dispute that Kirt could have, and was aware that she could have, completed any transaction that she desired notwithstanding Anderson's allegedly discriminatory conduct and Kirt's understandably hurt feelings from that conduct. Thus, under Eighth Circuit precedent, even if Anderson's conduct constituted "blatant discrimination," there was no actual interference with Kirt's right to "make" a contract sufficient to sustain a § 1981 claim.

Third, as explained above, the court is *not* holding that the plaintiff *must* attempt to make a purchase or must be refused service after discriminatory conduct in order to pursue a § 1981 right-to-contract claim. Instead, the court identified above certain circumstances in which the plaintiff's failure to attempt to make a purchase would not be fatal to her claim. The court has also noted that the standard is whether there was actual interference with the plaintiff's right to make a contract, not whether the plaintiff attempted to make a purchase. The court *is* holding, however, that, under the undisputed facts here, there was no actual interference with Kirt's right to make a contract as a matter of law, where there is no dispute that Kirt could have, and knew that she could have, completed a transaction, in light of Beaudette's conduct, but Kirt chose not to do so. The result might be quite different, however, had Beaudette not intervened and had Kirt left the store in the face of Anderson's conduct, even if Kirt had not attempted to make a transaction.

29

Finally, Kirt seems to suggest that nothing Beaudette did can undo Anderson's interference with Kirt's right to make a contract, even if Beaudette's conduct might mitigate Kirt's damages. Again, such an argument might be persuasive if § 1981 provided a "general cause of action for race discrimination," but it does not. *See id.* Because the test is whether there has been interference with a contractual right, *see id.*, the court concludes that an employer can "reopen the door" to a customer to make a contract after discriminatory conduct by an employee by making clear that the employer is willing to enter into a transaction with the offended customer. *Cf. Bagley*, 220 F.3d at 521-22 (another sales clerk's offer to help the plaintiff make a purchase upon his return later in the day "definitively establishes that [the store] would have sold [the plaintiff] a phone," and thus, the store had not interfered with the plaintiff's right to contract, where the plaintiff terminated the transaction). In other words, it is appropriate to conclude that, where the record shows beyond dispute that a customer could and knew that she could complete any desired transaction, notwithstanding a store employee's discriminatory conduct, there has been no interference with the customer's right to make a contract within the meaning of § 1981. Such a rule for liability properly focuses on whether or not the actor has engaged in prohibited conduct, rather than on the plaintiff's subjective reaction to that conduct. The offended person's subjective reaction, of course, might still be relevant to damages.

Even viewing summary judgment with the caution that this court has deemed to be appropriate for a § 1981 claim based on circumstantial evidence, as explained above on page 9, in the undisputed circumstances presented here, Kirt's § 1981 claim fails as a matter of law, because she cannot establish interference with her right to contract as required by the third element of her *prima facie* case. *See Daniels*, 373 F.3d at 887 (framing the third element of a plaintiff's § 1981 right-to-contract claim as "discrimination

30

interfering with a protected activity (i.e., the making and enforcement of contracts)"). Therefore, Fashion Bug is entitled to summary judgment on that claim. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

### C.  Kirt's Iowa Civil Rights Claim

Fashion Bug also seeks summary judgment in its favor on Kirt's claim that the racially discriminatory conduct to which she was subjected violated her rights under IOWA CODE § 216.7 to "accommodations, advantages, facilities, services, and privileges" without regard to her race and not to be "otherwise . . . discriminate[d] against . . . because of race . . . in the furnishing of such accommodations, advantages, facilities, services, or privileges." Kirt also resists summary judgment on this claim.

### 1.  Arguments of the parties

#### a.  Fashion Bug's initial argument

In support of this portion of its motion for summary judgment, Fashion Bug argues that, as with Kirt's § 1981 claim, there was no denial by Fashion Bug of any right secured by IOWA CODE § 216.7, because it is undisputed that Kirt was repeatedly invited to continue her shopping and to come back and shop again at any time. Fashion Bug also contends that there is no evidence that Kirt was ultimately treated less favorably than similarly-situated white persons. Again, Fashion Bug argues that there is no evidence of discrimination on the basis of race, even if Anderson made the comments attributed to her. Fashion Bug contends that it has a legitimate reason for greeting customers promptly and keeping an eye out for possible theft, which is to avoid or prevent losses from shoplifting. Fashion Bug contends that there is no evidence that this reason is a pretext, and no

31

evidence that Kirt was prevented from buying anything in light of Beaudette's intervention. Indeed, Fashion Bug contends that no racial comments were actually made, because the comments in question do not reasonably carry any racial connotation and the clerk who made the comments had a legitimate belief that Kirt had engaged in shoplifting the night before.

### b.    Kirt's response

In response, Kirt argues that Anderson's comments reveal a racially discriminatory animus and that no non-minority patrons were subjected to similar abusive comments or accusations.  Kirt also contends that any supposed store policy to greet customers as they enter does not explain why Anderson followed Kirt around the store after Kirt told her she did not require assistance nor does it explain Anderson's diatribe.

### c.    Fashion Bug's reply

In its Reply in further support of its motion, Fashion Bug argues that Kirt has pointed to no record evidence proving or suggesting that no non-minority patrons were treated differently nor has she pointed to any evidence that suggests that "you people" implies a racial animus.  Fashion Bug also contends that it is undisputed that no one at Fashion Bug refused or denied Kirt the right to buy pink jeans, in violation of § 216.7. Absent such evidence, Fashion Bug argues that Kirt must show that she was "otherwise discriminated" against, but she cannot generate a genuine issue of material fact that she was treated less favorably than other shoppers.

### 2.    Applicable law

### a.    The statute

The Iowa Civil Rights Act (ICRA) defines unfair practices in accommodations and services, in pertinent part, as follows:

1. It shall be an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation or any agent or employee thereof:

a. To refuse or deny to any person because of race, creed, color, sex, national origin, religion or disability the accommodations, advantages, facilities, services, or privileges thereof, or otherwise to discriminate against any person because of race, creed, color, sex, national origin, religion or disability in the furnishing of such accommodations, advantages, facilities, services, or privileges.

IOWA CODE § 216.7(1)(a). A "public accommodation" is defined in the ICRA as follows:

12. "Public accommodation" means each and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities, or goods for a fee or charge to nonmembers of any organization or association utilizing the place, establishment, or facility, provided that any place, establishment, or facility that caters or offers services, facilities, or goods to the nonmembers gratuitously shall be deemed a public accommodation if the accommodation receives governmental support or subsidy. Public accommodation shall not mean any bona fide private club or other place, establishment, or facility which is by its nature distinctly private, except when such distinctly private place, establishment, or facility caters or offers services, facilities, or goods to the nonmembers for fee or charge or gratuitously, it shall be deemed a public accommodation during such period.

"Public accommodation" includes each state and local government unit or tax-supported district of whatever kind, nature, or class that offers services, facilities, benefits, grants or goods to the public, gratuitously or otherwise. This paragraph shall not be construed by negative implication or otherwise to restrict any part or portion of the pre-existing definition of the term "public accommodation."

33

IOWA CODE § 216.2(12). Neither the statute nor case law, however, defines such terms as "accommodations," "advantages," "facilities," "services," or "privileges" of such a "public accommodation" or the meaning of "otherwise to discriminate."

### b. Requirements for proof of a claim

Iowa decisions considering the requirements to prove a claim comparable to Kirt's under § 216.7 or its predecessor, IOWA CODE § 601A.7, are sparse indeed. Nevertheless, some guidance can be gleaned from the recent decision of the Iowa Court of Appeals in *Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193 (Iowa Ct. App. 2006), in which a customer of a grocery store filed a § 216.7 claim alleging that the store had discriminated against her on the basis of race after the store's security system alerted as the customer left the store. In *Kiray*, the Iowa Court of Appeals recognized that civil rights cases under the ICRA, of which § 216.7 is a part, "are guided by federal law and federal cases," including the burden-shifting analytical framework for such claims, but that Iowa courts "do not substitute the language of the federal statutes for the language of the Iowa Civil Rights Act." *Kiray*, 716 N.W.2d at 202. The applicable burden-shifting analysis for a § 216.7 claim, thus, involves the plaintiff's presentation of a *prima facie* case, the defendant's assertion of a legitimate, non-discriminatory reason for its conduct, and if the defendant meets that burden, the return of the burden to the plaintiff to prove that the legitimate reason proffered by the defendant was not the true reason, but a pretext for discrimination. *Id.*

### i. Possible formulations of the prima facie case.

Although the Iowa Court of Appeals noted that the *prima facie* case must be adapted to the factual situation at hand, the court found that neither Iowa nor federal courts had adopted a uniform adaptation of the burden-shifting framework for claims of race discrimination in public accommodations.

34

*Id.* at 203. The Iowa Court of Appeals found, instead, that courts presented with similar claims generally had adopted one of two alternatives, "the *Callwood* prima facie case" and "the *Williams* prima facie case." *Id.* at 203-04. The explanation of these tests in *Kiray* deserves more detailed consideration.

In *Kiray*, the court noted, first, that some courts had adopted "the *Callwood* prima facie case," based on *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694 (D. Md. 2000), which had adapted the *McDonnell Douglas prima facie* case to a 42 U.S.C. § 1981 claim. *Kiray*, 716 N.W.2d at 203 (citing courts that have adopted "the *Callwood* prima facie case"). As the court in *Kiray* explained,

> Under that test, to satisfy a prima facie case of discrimination, plaintiffs must show
>
>> (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.
>
> *Callwood*, 98 F. Supp. 2d at 707.

*Kiray*, 716 N.W.2d at 203. Courts to reject this test, the Iowa Court of Appeals noted, found it inappropriate where there was sufficient evidence showing that minority plaintiffs were treated differently from similarly-situated whites. *Id.*

35

The alternative test identified by the Iowa Court of Appeals, "the *Williams* prima facie case," based on *Williams v. Staples, Inc.*, 372 F.3d 662 (4th Cir. 2004), requires the plaintiff to show the following:

> (1) he was a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the ordinary requirements for the contractual relationship; and (4) he was denied the opportunity to enter into the contract with the defendant, even though the defendant afforded such an opportunity to a white customer.

*Kiray*, 716 N.W.2d at 204 (citing *Williams*, 372 F.3d at 668). The Iowa Court of Appeals noted that the courts in *Hampton*, 247 F.3d at 1101-02, and *Office Max*, 89 F.3d at 413, both § 1981 cases discussed above, had used formulations of the *prima facie* case similar to the *Williams* formulation. *Kiray*, 716 N.W.2d at 204.

The Iowa Court of Appeals next identified the differences between the two *prima facie* cases and explained its reluctance to make a choice between them, as follows:

> The difference between the two is marked by the circumstantial evidence the plaintiff may use to show discrimination. Under *Callwood,* the plaintiff may either produce evidence indicating similarly situated individuals outside the protected class were treated differently or show the defendant acted in a markedly hostile manner. Factors relevant to determining what constitutes markedly hostile behavior include conduct that
>
> > (1) is so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.
>
> *Callwood,* 98 F. Supp 2d at 708.
>
> Under *Williams,* the plaintiff needs to show she was treated differently from similarly situated individuals outside the protected class. The advantage in the *Callwood* test is that

36

plaintiffs may still meet the prima facie case for discrimination even if there is little evidence as to how members of the protected class are treated differently from members outside the class. *See Burdine,* 450 U.S. at 253, 101 S. Ct. at 1094, 67 L. Ed. 2d at 215 (noting the burden of establishing the prima facie case should not be onerous). The disadvantage is that many courts have found the "markedly hostile" language of *Callwood* to be at best unhelpful and at worst vague. *See Watkins,* No. Civ. 04-211-B-H; *Benton,* 230 F. Supp. 2d at 1378.

If there was a time to adopt the *Callwood* test, this would be the case in which to do it. Kiray presents no evidence of similarly situated individuals. Without guidance from either the Eighth Circuit or our supreme court, however, we are loath to do so. Instead, we conclude Kiray fails to meet the prima facie case under both tests.

*Kiray,* 716 N.W.2d at 204 (subsequently explaining that the plaintiff had failed to meet her burden as to prongs (3)(a) and (3)(b) of the *Callwood* test and prong (4) of the *Williams* test).

  ***ii.***  ***The proper formulation***. Having decided not to decide which test was more appropriate, the Iowa Court of Appeals has left this court little the wiser as to what *prima facie* case Iowa courts are likely to apply to a public accommodations race discrimination claim under IOWA CODE § 216.7 of the sort that Kirt asserts here. This court, nevertheless, makes the following observations about the nominees for the applicable *prima facie* case identified by the Iowa Court of Appeals.

  First, both *prima facie* cases are drawn from § 1981 cases, but as explained above in reference to Kirt's own § 1981 claim, § 1981 claims require proof of a violation of some specific right protected by § 1981, such as the right to contract. *See Williams,* 288 F.3d at 355 (an element of the plaintiff's *prima facie* case is a showing that "the discrimination concerned an area enumerated by the statute"); *Youngblood,* 266 F.3d at 855 (the plaintiff

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 37 of 50

was required to point to interference with some contractual relationship to bring a claim under the right-to-contract provisions of § 1981). Both *prima facie* cases, therefore, are cast in terms of a contractual relationship. *See Callwood*, 98 F. Supp. 2d at 707 ("(3) they did not enjoy the privileges and benefits of the *contracted for experience*. . . .") (emphasis added); *Williams*, 372 F.3d at 668 ("(2) he sought to enter into *a contractual relationship* with the defendant; . . . and (4) he was denied the opportunity *to contract* for goods or services that was otherwise afforded to white customers.") (emphasis added). For precisely that reason, neither test can be applied without adaptation to a claim under IOWA CODE § 216.7, which unlike § 1981 makes absolutely no mention of "contractual" rights, *compare* IOWA CODE § 216.7 (establishing the right to enjoy "the accommodations, advantages, facilities, services, or privileges" of a "public accommodation" and the right not to be "otherwise . . . discriminate[d] against" in the furnishing of such rights), *with* 42 U.S.C. § 1981 (establishing, *inter alia*, the "right in every State and Territory *to make and enforce contracts*") (emphasis added), because it is improper to substitute the language of the federal statute for the language of the state statute. *See Kiray*, 716 N.W.2d at 202 ("We look to the analytical framework used by the federal courts in interpreting federal law, but do not substitute the language of the federal statutes for the language of the Iowa Civil Rights Act.") (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)).

Second, while § 1981 "does not provide a general cause of action for race discrimination if in fact it occurred," and instead requires proof of a violation of some specific right protected by § 1981, *Youngblood*, 266 F.3d at 855, the portion of § 216.7 making it a prohibited practice "otherwise to discriminate against any person because of race . . . in the furnishing of such accommodations, advantages, facilities, services, or privileges" could not more clearly authorize a "general cause of action for race discrimination." *See, e.g., Cubit v. Mahaska County*, 677 N.W.2d 777, 781-82 (Iowa

38

2004) ("We do not search for meaning beyond the express terms of a statute when the statute is plain and its meaning is clear."). Thus, the scope of a § 216.7 claim is considerably broader than the scope of a § 1981 claim, and the *prima facie* case must reflect that broader scope.

Third, the "markedly hostile" prong of the third element of the *Callwood* test does address circumstances in which there are no similarly-situated white persons with whom the plaintiff can compare herself, while the *Williams* test does not. *See Kiray*, 716 N.W.2d at 203. The "otherwise to discriminate" provision of § 216.7 not only embraces a broader scope than § 1981, but reasonably contemplates within that scope "hostile environment" discrimination, which, like disparate treatment, is a recognized form of racial discrimination. Thus, a *prima facie* case that reflects the possibility of "hostile environment" race discrimination is more appropriate than one that does not. As a corollary to this point, this court does not believe that the "markedly hostile" language of *Callwood* is either "unhelpful" or "vague," *Kiray*, 716 N.W.2d at 204, at least where "markedly hostile" is further defined as conduct that "(1) is so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination," and the plaintiff must also prove that the conduct was "in a manner that a reasonable person would find objectively unreasonable." *Callwood,* 98 F. Supp 2d at 708.

Moreover, even as to the "deprived of services" prong of the third element of the *Callwood* test (prong (3)(a)), this court can find nothing in § 216.7 or the sparse applicable case law that *requires* proof that similarly-situated persons not in the plaintiff's protected class were treated differently to prove discrimination. When considering the *prima facie* case for claims of discrimination under other provisions of § 216 or federal law, courts

39

have often formulated the third element of the plaintiff's *prima facie* case in terms of a showing that the defendant's conduct "occurred under circumstances giving rise to an inference of discrimination." *See, e.g., Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005) (so formulating the third element of a *prima facie* case of pregnancy discrimination in employment under 42 U.S.C. § 2000e and Iowa Code § 216.6); *Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 328 (Iowa 1998) (so formulating the third element of a *prima facie* case of disability discrimination in employment under § 216.6); *Arnold v. Nursing and Rehab. Ctr. at Good Shepherd, L.L.C.*, 471 F.3d 843, 846 (8th Cir. 2006) (so formulating the final element of a *prima facie* case of race discrimination in employment pursuant to Title VII). Although different treatment of similarly-situated persons not in the plaintiff's protected class is *one* kind of evidence that may demonstrate an inference of discrimination, it is not the only kind of evidence that does so. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 936 (8th Cir. 2006) ("Contrasting the treatment of similarly situated employees outside of the protected class with the employee's treatment is *one way* to point towards a race-based motivation.") (emphasis added); *Harris v. Hays*, 452 F.3d 714, 718 (8th Cir. 2006) ("*One way* for the claimant to establish the . . . defendant's intent to discriminate is to show that he was treated differently from similarly situated nonmembers of the protected class.") (emphasis added); *see generally Allen v. Interior Constr. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000) ("An inference of discrimination arises where there is some evidence of a causal connection between a plaintiff's [protected characteristic] and the adverse employment action taken against the plaintiff. *See Greer v. Emerson Elec. Co.*, 185 F.3d 917, 922 (8th Cir. 1999). The evidence most often used to establish this connection is that of disparate treatment, whereby a plaintiff shows that he was 'treated less favorably than similarly situated employees who are not in plaintiff's protected class.' *See Wallin v. Minn. Dep't of*

40

*Corrections*, 153 F.3d 681, 687 (8th Cir. 1998) (quoting *Johnson v. Legal Services of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir. 1987)).  However, *evidence of disparate treatment is not the exclusive means by which a plaintiff may establish an inference of discrimination*, *see Young [v. Warner-Jenkinson Co.]*, 152 F.3d [1018,] 1022 [(8th Cir. 1998)]; any credible evidence tending to establish that an employer acted adversely to an individual 'on account of' his disability will suffice.  *See Greer*, 185 F.3d at 922.") (emphasis added).  Thus, importing a "similarly situated" requirement into the plaintiff's *prima facie* case of discrimination under § 216.7 artificially limits the scope of the statute.

The court concludes that the *Callwood* test, properly adapted, would provide a more appropriate statement of a *prima facie* case for a race discrimination claim under § 216.7 of the kind that Kirt asserts here than would a test adapted from *Williams*, because the alternative means of proving the third element under the *Callwood* test more effectively embrace the scope of a § 216.7 claim that may involve either refusal or denial of "the accommodations, advantages, facilities, services, or privileges" of a "public accommodation" or conduct that "otherwise . . . discriminate[d] against" the plaintiff. The *Callwood* test, which is designed for a § 1981 claim, must still be adapted more specifically to the language of the Iowa statute and the factual situation at hand, however. *Kiray*, 716 N.W.2d at 203 (the *prima facie* case must be adapted to the factual situation at hand and the language of the federal statute must not be substituted for the language of the Iowa statute).  Thus, the court concludes that a properly adapted *prima facie* case for Kirt's § 216.7 claim requires Kirt to prove the following:  (1) she is a member of a protected class; (2) she sought to enjoy the accommodations, advantages, facilities, services, or privileges of a "public accommodation"; and (3) she did not enjoy the accommodations, advantages, facilities, services, or privileges of the "public accommodation" in that (a) she was refused or denied the accommodations, advantages,

41

facilities, services, or privileges of the "public accommodation" under circumstances giving rise to an inference of discrimination, *or* (b) she was allowed to use the accommodations, advantages, facilities, services, or privileges of the "public accommodation," but was otherwise discriminated against in the furnishing of those accommodations, advantages, facilities, services, or privileges by being subjected to markedly hostile conduct that a reasonable person would find objectively unreasonable under circumstances giving rise to an inference of discrimination.

### 3. *Analysis*

#### a. *Kirt's prima facie case*

**i.** ***Membership in a protected class***. For the sake of completeness, there is no dispute that Kirt satisfies the first element of her *prima facie* case, because, as an African-American female, she is a member of a protected class. *See Kiray*, 716 N.W.2d at 203-04 (under any formulation of the *prima facie* case, the first element is that the plaintiff was a member of a protected class). Thus, the court will pass quickly on to disputed elements.

**ii.** ***Attempt to enjoy accommodations***. As posited above, the second element of Kirt's *prima facie* case for her § 216.7 claim requires her to show that she attempted to enjoy the accommodations, advantages, facilities, services, or privileges of a "public accommodation." *Cf. Kiray*, 716 N.W.2d at 203-04 (under either *Callwood* or *Williams*, the second element requires availability to receive the benefits of the statute). There is, at least, a genuine issue of material fact that Kirt satisfied this element of her *prima facie* case by seeking to shop at Fashion Bug on October 20, 2004. There does not appear to be any dispute that Fashion Bug is a "public accommodation" as defined in IOWA CODE § 216.2(12). Moreover, the court has not recognized any argument by the parties, at least for purposes of summary judgment, as calling into question whether or not Kirt was

42

seeking to enjoy the accommodations, advantages, facilities, services, or privileges of Fashion Bug by seeking to shop there.

     *iii.    Refusal or denial of accommodations or other discrimination*.  As posited above, the third element of Kirt's *prima facie* case requires her to show that she did not enjoy the accommodations, advantages, facilities, services, or privileges of the "public accommodation" in that (a) she was refused or denied the accommodations, advantages, facilities, services, or privileges of the "public accommodation" under circumstances giving rise to an inference of discrimination, *or* (b) she was allowed to use the accommodations, advantages, facilities, services, or privileges of the "public accommodation," but was otherwise discriminated against in the furnishing of those accommodations, advantages, facilities, services, or privileges by being subjected to markedly hostile conduct that a reasonable person would find objectively unreasonable under circumstances giving rise to an inference of discrimination.  Contrary to Fashion Bug's contentions, the court finds that Kirt can generate genuine issues of material fact as to both prongs of this element, as well.

     Fashion Bug argues that Kirt cannot show that she was refused or denied the accommodations, advantages, facilities, services, or privileges of the "public accommodation," because the record shows beyond dispute that, after Anderson's tirade, Beaudette invited Kirt to continue shopping and Kirt understood that she could continue to shop and could obtain Beaudette's help if she needed it.  Fashion Bug also asserts that Kirt has failed to show that any similarly-situated white persons were treated differently.

     Taking Fashion Bug's second contention first, the court held, above, that requiring proof that similarly-situated white persons were treated differently is an unduly restrictive formulation of this element of Kirt's *prima facie* case.  Thus, Kirt's failure to generate

Case 5:05-cv-04142-MWB   Document 20   Filed 03/28/07   Page 43 of 50

evidence that similarly-situated white persons were treated differently is not fatal to her claim.

As to Fashion Bug's contention that Beaudette's invitation to Kirt to continue shopping and Kirt's knowledge that she could continue shopping precludes Kirt's claim, the court also disagrees, because such a contention improperly equates the scope of a "public accommodation" claim under § 216.7 claim with the scope of a right-to-contract claim under § 1981. As noted above, a § 1981 claimant must show interference with a right enumerated in the statute, *Williams*, 288 F.3d at 355, which includes the right to make and enforce contracts, *see Daniels*, 373 F.3d at 887, and that specific right includes the right to purchase goods. *Id.* The Iowa "public accommodations" statute, IOWA CODE § 216.7, on the other hand, is not limited to the right to make and enforce contracts or to purchase goods. Instead, the statute forbids a public accommodation to "refuse or deny to any person because of race . . . the accommodations, advantages, facilities, services, or privileges [of the public accommodation], or otherwise to discriminate against any person because of race . . . in the furnishing of such accommodations, advantages, facilities, services, or privileges." IOWA CODE § 216.7(1)(a). Fashion Bug contends that "refuse or deny" prohibits more specific kinds of conduct than "interference" under § 1981, so that the Iowa statute is actually narrower. The court finds, however, that § 216.7 is broader than § 1981, because it not only prohibits "denying" or "refusing" certain rights, but "otherwise discriminating" in "the furnishing" of such rights, which is broader than a prohibition on "interference" with certain rights. Moreover, § 216.7 does not prohibit conduct affecting only one right, the right to "make and enforce contracts,"

44

as § 1981 does,[6] but conduct affecting a panoply of rights incident to use of a public accommodation, consisting of rights to the "accommodations, advantages, facilities, services, or privileges" or "the furnishing of such accommodations, advantages, facilities, services, or privileges." These rights reasonably extend to rights to be on the property of a retail establishment (*i.e.*, the rights to enjoy the "accommodations" or "facilities" of the establishment) and to browse the merchandise offered by the retail establishment (*i.e.*, the right to enjoy the "privileges" of the establishment) without refusal or denial of entry or presence and without being subjected to other discrimination. Because § 216.7 prohibits a broader range of conduct and protects a broader range of rights to a public accommodation than § 1981 does, it is not necessary for a plaintiff under § 216.7 to show that she was actually denied the right to make a purchase. *Compare Garrett*, 295 F.3d at 100-01 (summarizing § 1981 right-to-contract cases as requiring a retail customer to allege "that he was *actually denied* the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a race-based animus") (emphasis added). That being so, even if it is undisputed that Kirt could have, and knew that she could have, made a purchase at Fashion Bug after Beaudette's intervention, but did not attempt to do so, that undisputed fact does not necessarily mean that there was no refusal or denial of Kirt's rights under § 216.7.

To the contrary, the court finds that there are, at least, genuine issues of material fact on the "refuse or deny" alternative for Kirt's § 216.7 claim, which is embodied in

---

[6]As noted elsewhere, § 1981 also prohibits interference with "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," and requires that all persons "be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). These further prohibitions and requirements are not at issue here, however.

45

alternative (a) of the third element of her *prima facie* case. That alternative, as posited above, requires Kirt to show that she did not enjoy the accommodations, advantages, facilities, services, or privileges of the "public accommodation" in that (a) she was refused or denied the accommodations, advantages, facilities, services, or privileges of the "public accommodation" under circumstances giving rise to an inference of discrimination. First, there are at least genuine issues of material fact that, by launching into her tirade and attempting to eject Kirt from the store, Anderson refused or denied Kirt her rights to be on the property of the retail establishment (*i.e.*, the rights to enjoy the "accommodations" or "facilities" of the establishment) and to browse the merchandise offered by the retail establishment (*i.e.*, the right to enjoy the "privileges" of the establishment). Second, in the light most favorable to Kirt, and giving Kirt all reasonable inferences from the record, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts), a reasonable jury could find that Anderson's comments, as recounted by Kirt and not disputed by Fashion Bug for present purposes, give rise to an inference of discrimination. Anderson's comments—including "I get sick and tired of you people," and "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags"—when made to two African-Americans, reasonably suggest a discriminatory intent to accuse African-Americans generally of tending to engage in or invariably engaging in shoplifting and tending to make or invariably making messes in the store. Indeed, a reasonable jury could find that Fashion Bug's strained interpretation of the comments as innocuous shows disingenuousness or sophistry.

Similarly, the court finds that there are, at least, genuine issues of material fact on the "otherwise discriminate" alternative for Kirt's § 216.7 claim, which is embodied in

46

alternative (b) of the third element of her *prima facie* case. That alternative element, as posited above, requires Kirt to show that she was allowed to use the accommodations, advantages, facilities, services, or privileges of the "public accommodation," but was otherwise discriminated against in the furnishing of those accommodations, advantages, facilities, services, or privileges by being subjected to markedly hostile conduct that a reasonable person would find objectively unreasonable under circumstances giving rise to an inference of discrimination. Moreover, "markedly hostile" conduct means conduct that "(1) is so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Callwood,* 98 F. Supp 2d at 708. Contrary to Fashion Bug's contentions, Anderson's conduct gives rise to reasonable inferences that it fits all these requirements. Again, a reasonable jury could conclude that Anderson's comments suggest a discriminatory intent to accuse African-Americans generally of tending to engage in or invariably engaging in shoplifting and tending to make or invariably making messes in the store and that they are "markedly hostile." Just as importantly, for purposes of the present claim, even if a merchant has a manifest financial interest in controlling shoplifting, Anderson's comments, which can reasonably be understood to accuse a whole minority group of thievery, are "so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely accepted business norms; and (3) so arbitrary on [their] face, that the conduct supports a rational inference of discrimination." *Callwood,* 98 F. Supp 2d at 708. Finally, a reasonable person could find such markedly hostile conduct objectively unreasonable. *Id.*

Thus, Fashion Bug is not entitled to summary judgment on Kirt's § 216.7 claim based on the supposed insufficiency of Kirt's *prima facie* case.

47

### b.  *Fashion Bug's legitimate reasons*

Because Kirt has generated a sufficient *prima facie* case on her § 216.7 claim, the burden shifts to Fashion Bug to assert a legitimate, non-discriminatory reason for its conduct.  *Kiray*, 716 N.W.2d at 202.  Fashion Bug contends that, as a merchant, it has a legitimate reason to monitor customers, which is to protect itself against theft of merchandise.  At least implicitly, Fashion Bug also asserts that it had legitimate reasons to monitor Kirt in this way on October 20, 2004, where Anderson reasonably believed that Kirt had engaged in shoplifting on her prior visit to the store, because Anderson had found an empty hanger and broken security sensor after Kirt left at or near where Kirt had been looking at merchandise.  The court agrees with Kirt, however, that even if this proffered explanation states a legitimate, non-discriminatory reason for greeting and monitoring customers generally and Kirt in particular, it certainly does not provide any legitimate, non-discriminatory reason for Anderson's tirade, which included what reasonable jurors could find was racially hostile comments and accusations.  In other words, Fashion Bug's explanation states no legitimate, non-discriminatory reason for the conduct that Kirt actually contends, and a jury could reasonably find, was discriminatory.  Thus, the court has considerable doubt that Fashion Bug has met its burden at the second stage of the burden-shifting analysis of Kirt's § 216.7 claim.

### c.  *Kirt's showing of pretext and discrimination*

Finally, assuming that Fashion Bug has stated legitimate, non-discriminatory reasons for its conduct, the court will consider whether, on shifting the burden back to Kirt, she has shown or generated genuine issues of material fact that Fashion Bug's reasons are not the true reasons, but are pretexts for discrimination.  *Kiray*, 716 N.W.2d at 202.  The court finds that Kirt has met her burden, at least to the extent that she must do so to defeat a motion for summary judgment.

48

First, for the reasons stated above, Fashion Bug's attempt to "spin" Anderson's comments as not conveying any discriminatory intent fares no better here than it did in reference to Kirt's § 1981 claim. A reasonable jury could conclude that the "you people" to whom Anderson referred could not have been Kirt and Israel, because Israel had never been in Fashion Bug before and Kirt's prior visit to the store had been in the company of her young daughter.  Next, Anderson's comments—including "I get sick and tired of you people," and "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags"—reasonably suggest that the "you people" in question are members of some group of people who came in with sufficient frequency for Anderson to be "tired" of their behavior and for Anderson to find evidence of shoplifting "every time" such people came in.  In the light most favorable to Kirt, and giving Kirt all reasonable inferences from the record, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts), a reasonable jury could find that the comments, when made to two African-Americans, were discriminatory accusations that African-Americans generally tend to engage in or invariably engage in shoplifting and tend to make or invariably make messes in the store, and a reasonable jury could also find that Fashion Bug's strained interpretation of the comments as innocuous is not only false, but a pretext for discrimination.  *Kiray*, 716 N.W.2d at 202 (third stage burden).  Moreover, even though an interest in monitoring customers to prevent theft may be legitimate, a jury could reasonably find that such a legitimate interest in no way justified Anderson's *comments*, which carried a strong inference of racial animus, so that the proffered justification is not only false, but pretextual.  *Id.*

49

Therefore, Fashion Bug is not entitled to summary judgment on Kirt's § 216.7 claim that she was "refused" or "denied" or "otherwise discriminated" against in her enjoyment of the accommodations, advantages, facilities, services, or privileges of a "public accommodation." This matter will proceed to trial on that claim.

### III. CONCLUSION

Upon the foregoing, Kirt's claim pursuant to 42 U.S.C. § 1981 fails as a matter of law, because she cannot establish interference with her right to contract as required by the third element of her *prima facie* case for such a claim. On the other hand, Kirt's claim pursuant to IOWA CODE § 216.7 will proceed to trial, because the court finds that there are, at least, genuine issues of material fact on that claim.

THEREFORE, Fashion Bug's December 21, 2006, Motion For Summary Judgment (docket no. 10) is **granted in part and denied in part**, as follows:

1.    The motion is **granted** as to Kirt's claim pursuant to 42 U.S.C. § 1981 in **Count I** of her Complaint.

2.    The motion is **denied** as to Kirt's claim pursuant to IOWA CODE § 216.7 in **Count II** of her Complaint.

IT IS FURTHER ORDERED that this matter shall proceed to trial as scheduled on October 9, 2007, on Kirt's remaining claim.

**IT IS SO ORDERED.**

**DATED** this 28th day of March, 2007.

*Mark W. Bennett*

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

50