**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

KAREN M. KIRT,

        Plaintiff,

vs.

FASHION BUG #3253, INC., an Iowa corporation,

        Defendant.

No. C 05-4142-MWB

**MEMORANDUM OPINION AND ORDER ON *SUA SPONTE* RECONSIDERATION OF ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM PURSUANT TO 42 U.S.C. § 1981**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *1. Kirt's Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *2. Fashion Bug's Motion For Summary Judgment* . . . . . . . . . . 6
        *3. The original ruling on the § 1981 claim* . . . . . . . . . . . . . . 6
        *4. The* sua sponte *order for reconsideration* . . . . . . . . . . . . . 11

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *A. Standards For Reconsideration* . . . . . . . . . . . . . . . . . . . . . . . 12
    *B. The Decision In* Green . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *C. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        *1. Kirt's argument for reconsideration* . . . . . . . . . . . . . . . . 22
        *2. Fashion Bug's response* . . . . . . . . . . . . . . . . . . . . . . . 23
        *3. Kirt's reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    *D. Application Of* Green . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      1.     ***Elements of the* prima facie *case in dispute*** . . . . . . . . . . . 26
      2.     ***Interference with a contractual right*** . . . . . . . . . . . . . . . . 27
           *a.*     ***Contractual relationship or interest*** . . . . . . . . . . . . 27
           *b.*     ***Actionable interference with the contractual interest*** . . 29
      3.     ***Summary*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

This matter is before the court *sua sponte* for reconsideration of an order granting summary judgment for the defendant merchant on an African-American customer's "right-to-contract" race discrimination claim pursuant to 42 U.S.C. § 1981. The court granted summary judgment for the merchant on the ground that the record shows beyond dispute that, notwithstanding a store employee's discriminatory conduct, the customer could, and knew that she could, complete any desired transaction, where the store manager encouraged her to continue shopping. Under these circumstances, the court concluded that, as a matter of law, there had been no interference with the customer's right to make a contract within the meaning of § 1981. *See Kirt v. Fashion Bug #3253, Inc.*, 479 F. Supp. 2d 938 (N.D. Iowa 2007).[1] Just days after the court's ruling, however, the Eighth Circuit Court of Appeals handed down its decision in *Green v. Dillard's, Inc.*, 483 F.3d 533 (8th Cir. 2007), in which it reversed summary judgment in favor of a merchant on a retail customer's § 1981 "right-to-contract" claim. This court found that the decision in *Green* would have been relevant to the court's

---

[1]In contrast, the court denied the merchant's motion for summary judgment on the customer's "public accommodations" claim pursuant to the Iowa Civil Rights Act (ICRA), Iowa Code § 216.7.

disposition of the merchant's summary judgment motion in this case on the customer's § 1981 claim. Consequently, the court *sua sponte* directed the parties to brief the question of whether the decision in *Green* requires the court to set aside the order granting summary judgment for the merchant on the customer's § 1981 claim in this case. Upon completion of the required briefing, and due consideration of the decision in *Green* and the parties' arguments, the court enters this ruling reconsidering the viability of the customer's § 1981 claim.

## I. INTRODUCTION

### A. Factual Background

Because the facts are material to the court's reconsideration of the viability of the plaintiff's § 1981 claim, just as they were material to its original summary judgment motion, the court will reprise the pertinent facts here.

Plaintiff Karen M. Kirt is an African-American woman. Defendant Fashion Bug #3253, Inc., (Fashion Bug) is a retail women's clothing store in Sioux City, Iowa. The parties agree that, on October 19, 2004, Kirt, accompanied by her young daughter, made one of only a handful of visits that she had ever made to Fashion Bug. Kirt does not remember being greeted by any store employee as she entered the store. Kirt contends that she did not stay in the store very long, probably only about fifteen minutes, because her daughter was running around. Kirt decided to leave the store without making any purchases and to return the next day without her daughter. Fashion Bug contends that a store employee, Melissa ("Missy") Anderson, recalls that Kirt was carrying a large, unzipped purse that looked empty and that, after Kirt left, Anderson found an empty hanger and a broken security sensor. Fashion Bug contends that Anderson then called the

Case 5:05-cv-04142-MWB   Document 26   Filed 07/10/07   Page 3 of 34

store manager, Margaret ("Maggie") Beaudette, to report the incident. Kirt denies Anderson's version of events as "self-serving."

The parties agree that Kirt returned to Fashion Bug the next evening, October 20, 2004, accompanied by her boyfriend, now husband, Israel. Kirt contends that she returned to the store to purchase pink jeans, which she had been led to believe by a friend could be found at Fashion Bug. Kirt contends that, when she entered the store, Beaudette approached her and said, "Hi," to which Kirt and Israel responded, "Hi." Anderson stated in her deposition that she was leaving for lunch as Kirt came in, but recognized Kirt as the person who had been acting suspiciously the day before, so Anderson remained in the store and notified Beaudette that she had recognized Kirt.

Fashion Bug admits, for purposes of this motion, Kirt's version of what then occurred. Kirt contends that Anderson approached Kirt and asked if she could help her, what she needed, and if she and her companion were looking for something in particular, but Kirt told Anderson that the other woman (Beaudette) had already greeted her and that she did not need any help. Kirt contends that, thereafter, Anderson followed wherever Kirt and Israel walked in the store. At some point—neither party's statement of facts makes clear what was the catalyst—Anderson purportedly said, "I get sick and tired of you people," "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags," screamed at Kirt, and told her that if she did not leave the store, Anderson would call the police. Beaudette approached at some point in the course of this incident to try to get Anderson to stop, apologized for Anderson's behavior, and asked Kirt to "finish [her] shopping." Kirt admits that Beaudette was very pleasant (in cited portions of her deposition, Kirt described Beaudette as "really nice"), that Beaudette provided Kirt with a contact telephone number to advise Fashion Bug representatives of her complaints, and that Beaudette gave her Anderson's

4

name. Kirt nevertheless left the store, went home, and started crying. Kirt later contacted a representative of Fashion Bug, provided information about what had happened on October 20, 2004, and was assured that the representative would look into it. Kirt has never returned to the Fashion Bug store.

Fashion Bug contends that it is store policy to greet customers promptly and to watch them as they move about the store to avoid or minimize theft, which is a large problem in the retail industry. Kirt denies the existence of such a policy, because Kirt contends that no such policy has been produced in this litigation, and the court notes that no such policy appears in either party's appendix.

## B. Procedural Background

### 1. Kirt's Complaint

Kirt filed her Complaint And Jury Demand (docket no. 1) in this action on November 29, 2005, naming Fashion Bug as the sole defendant on a theory of *respondeat superior* liability for the conduct of the store clerk, Missy Anderson, and asserting that such conduct constituted race discrimination in violation of both 42 U.S.C. § 1981 (**Count I**) and IOWA CODE § 216.7 (**Count II**).[2] Kirt seeks declaratory relief, compensatory damages including damages for emotional distress, punitive damages, costs, attorneys fees, and such other relief as she may be entitled to obtain. Fashion Bug filed its Answer And Jury Demand (docket no. 4) on January 11, 2006, denying Kirt's claims and alleging, as an affirmative defense, that Kirt's Complaint fails to state claims upon which relief can be granted. Trial in this matter was originally set for May 21, 2007, but

---

[2]Kirt's state-law claim is improperly designated another "**Count I**" in her Complaint.

Case 5:05-cv-04142-MWB    Document 26    Filed 07/10/07    Page 5 of 34

was subsequently rescheduled to begin on October 9, 2007, on Kirt's unresisted motion for a continuance.

### 2. *Fashion Bug's Motion For Summary Judgment*

On December 21, 2006, Fashion Bug filed a Motion For Summary Judgment (docket no. 10) on both of Kirt's claims. Kirt filed her Resistance (docket no. 11) on January 16, 2007, and Fashion Bug filed its Reply (docket no. 13) in further support of its motion on January 23, 2007. The court heard oral arguments on Fashion Bug's Motion For Summary Judgment on March 15, 2007. On March 28, 2007, the court entered its ruling granting Fashion Bug's motion for summary judgment on Kirt's § 1981 claim, but denying the motion for summary judgment on Kirt's ICRA claim. *See See Kirt v. Fashion Bug #3253, Inc.*, 479 F. Supp. 2d 938 (N.D. Iowa 2007).

### 3. *The original ruling on the § 1981 claim*

In its original ruling on Fashion Bug's motion for summary judgment on Kirt's § 1981 claim, the court found that Fashion Bug had only challenged the sufficiency of Kirt's *prima facie* case. *Kirt*, 479 F. Supp. 2d at 948. The court concluded that, to establish a *prima facie* claim of racial discrimination under § 1981, Kirt was required to show the following: (1) that she is a member of a racial minority, (2) that the defendant intended to discriminate against her on the basis of race, and (3) that the discrimination concerned an area enumerated by the statute, in this case, Kirt's "right to contract." *See id.* (citing *Williams v. Lindenwood Univ.*, 288 F.3d 349, 355 (8th Cir. 2002), in turn quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)), and also citing as in accord *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004), and *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004)). There was clearly no dispute that Kirt, an African-American female, satisfies the first element of her *prima facie* case, so the focus of the parties' dispute was the second and third elements.

6

As to the "intentional discrimination" element, the court rejected Fashion Bug's contention that nothing but speculation raised an inference of discrimination from Anderson's comments about "you people," because Fashion Bug contended that it was unrebutted that the "you people" referred to were Kirt and her boyfriend, Israel. The court concluded, instead, that a reasonable jury could find that the "you people" to whom Anderson referred could not have been Kirt and Israel, because Israel had never been in Fashion Bug before, and Kirt's prior visit to the store had been in the company of her young daughter. Second, Anderson's comments—including "I get sick and tired of you people," and "I just get tired of them coming in and messing up things and . . . every time you people come we find hangers and beeper tags"—reasonably suggest that the "you people" in question are members of some group of people who came into the store with sufficient frequency for Anderson to be "tired" of their behavior and for Anderson to find evidence of shoplifting "every time" such people came in. One class of people to whom Kirt and Israel belong is African-Americans. Thus, the court concluded that a reasonable jury could find that Anderson's comments, as recounted by Kirt and not disputed by Fashion Bug for present purposes, directed at two African-Americans, suggest a discriminatory intent to accuse African-Americans generally of tending to engage in or invariably engaging in shoplifting and tending to make or invariably making messes in the store. Furthermore, the court concluded that a reasonable jury would certainly be under no obligation to accept as true Anderson's explanation of her comments, in light of other evidence in the record of the circumstances in which those comments were made. Indeed, the court concluded that a reasonable jury could find that Fashion Bug's strained interpretation of the comments as innocuous results from disingenuousness or sophistry and, as such, is a pretext for discriminatory comments. *Id.* at 950-51.

7

Consequently, the focus shifted to the "interference with a right to contract" element of Kirt's *prima facie* case of § 1981 race discrimination. On this element, the court found instructive the decision of the Seventh Circuit Court of Appeals in *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000), in which the appellate court concluded that a retail store was not responsible for terminating a transaction with an African-American customer, because another sales clerk's offer to help the plaintiff make a purchase upon his return to the store later in the day definitively established that the store would have sold the plaintiff the telephone he wanted. *See Kirt*, 479 F. Supp. 2d at 953 (citing *Bagley*, 220 F.3d at 521-22). This court was not convinced that a mere invitation to an offended person to continue shopping after racially discriminatory treatment—however disingenuous or insincere that invitation or whatever conduct belying an intent to serve the person might accompany the invitation—necessarily inoculates a retailer from any and all § 1981 right-to-contract claims, because the question under the statute is not merely whether an invitation of some sort to complete a transaction was made, but whether the conduct of the merchant interfered with the customer's right to make or enforce a contract. *Id.* at 954.

This court did find, however, that there is no evidence giving rise to an inference that Beaudette's invitation to Kirt to continue shopping was a sham or that any attempt by Kirt to purchase an item from Fashion Bug would have been futile, even in light of Anderson's statements. The court concluded that, while Kirt was justifiably hurt by what she reasonably perceived (and a reasonable juror could perceive) to be reprehensible discriminatory comments by Anderson, the record shows beyond dispute that Kirt could not have reasonably believed that there was no point in attempting to make a purchase after Beaudette's intervention. *Id.* (citing *Bagley*, 220 F.3d at 521, as holding that the plaintiff was not at fault for taking offense at improper comments, but that it was nevertheless clear

that the merchant intended that another employee, who had not made discriminatory comments, would continue to serve the plaintiff). As this court explained,

> There is not the slightest hint that Beaudette's offer to Kirt to continue shopping was in any way disingenuous or belied by other conduct or circumstances. Indeed, on the undisputed record, Beaudette not only stopped Anderson's conduct, invited Kirt to finish her shopping, and offered to help Kirt with whatever she needed, but provided Kirt with all of the information necessary to make a complaint about Anderson's conduct over Beaudette's head to company representatives. Nor is there any dispute that Kirt understood the sincerity of Beaudette's offer, because she believed that Beaudette had been "really nice." Under these undisputed circumstances, it is plain that Kirt terminated the opportunity to enter into a contract or purchase of goods by leaving the store. *Cf.* *[Bagley]*, 220 F.3d] at 521 (the plaintiff had no § 1981 claim, because the plaintiff "cut off his exchange-and thus the opportunity to buy the phone-by leaving the store"). Even though such a reaction to the discriminatory conduct by Anderson was entirely understandable, Kirt's hurt feelings and emotional upset resulting from discriminatory conduct, which prompted her to abandon her shopping, do not establish that the discriminatory conduct actually violated her § 1981 right to contract.

*Kirt*, 479 F. Supp. 2d at 954-55.

The court also concluded that the "make or enforce contracts" provision of § 1981 could not be read so broadly as to prohibit any interference, of any kind, at any point in the "shopping" process as an interference with the right to "make" a contract. *Id.* 955. In so concluding, the court, first, rejected Kirt's contrary interpretation of various authorities. *Id.* at 955-56. Second, the court believed that the Eighth Circuit Court of Appeals would require a closer nexus between the allegedly discriminatory conduct and the interference with a customer's right to "make and enforce contracts" than Kirt has

9

shown, because the Eighth Circuit Court of Appeals has concluded that § 1981 does not provide a "'general cause of action for race discrimination if it in fact occurred,'" and has, instead, read the statute to require proof of interference with "'some contractual relationship,'" even if the plaintiff was "'blatantly discriminated against.'" *Id.* at 956 (quoting *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001), *cert. denied*, 535 U.S. 1017 (2002)). Here, this court concluded, there is no genuine dispute that Kirt could have, and was aware that she could have, completed any transaction that she desired notwithstanding Anderson's allegedly discriminatory conduct and Kirt's understandably hurt feelings from that conduct, so that, under Eighth Circuit precedent, even if Anderson's conduct constituted "blatant discrimination," there was no actual interference with Kirt's right to "make" a contract sufficient to sustain a § 1981 claim. *Id.* Third, the court reiterated that it was not holding that the plaintiff must attempt to make a purchase or must be refused service after discriminatory conduct in order to pursue a § 1981 right-to-contract claim, but was holding that, under the undisputed facts here, there was no actual interference with Kirt's right to make a contract as a matter of law, where there is no dispute that Kirt could have, and knew that she could have, completed a transaction, in light of Beaudette's conduct, but Kirt chose not to do so. *Id.* (noting that the result might be quite different, had Beaudette not intervened and had Kirt left the store in the face of Anderson's conduct, even if Kirt had not attempted to make a transaction).

Finally, the court rejected Kirt's contention that nothing Beaudette did can undo Anderson's interference with her right to make a contract, even if Beaudette's conduct might mitigate Kirt's damages. Again, the court rejected this argument, because § 1981 does not provide a "general cause of action for race discrimination." Because the test is whether there has been interference with a contractual right, the court concluded that an employer can "reopen the door" to a customer to make a contract after discriminatory

10

conduct by an employee by making clear that the employer is willing to enter into a transaction with the offended customer. *Id.* at 956-57 (again citing *Bagley*, 220 F.3d at 521-22, as indirect support). The court concluded that, where the record shows beyond dispute that a customer could, and knew that she could, complete any desired transaction, notwithstanding a store employee's discriminatory conduct, there has been no interference with the customer's right to make a contract within the meaning of § 1981. The court reasoned that such a rule for liability properly focuses on whether or not the actor has engaged in prohibited conduct, rather than on the plaintiff's subjective reaction to that conduct. *Id.* at 957 (noting, however, that the offended person's subjective reaction might still be relevant to damages).

For these reasons, the court granted Fashion Bug's motion for summary judgment on Kirt's § 1981 claim.

### 4. The *sua sponte order for reconsideration*

On April 16, 2007, the court entered an order (docket no. 21) noting that, on April 5, 2007, exactly one week after it had entered its summary judgment ruling, the Eighth Circuit Court of Appeals handed down its decision in *Green v. Dillard's, Inc.*, 483 F.3d 533 (8th Cir. 2007), which this court found would have been relevant to its disposition of Fashion Bug's motion for summary judgment on Kirt's § 1981 claim. Consequently, the court found that it should reconsider its disposition of Kirt's § 1981 claim in light of the subsequent decision in *Green* and should require briefing from the parties concerning whether the decision in *Green* requires the court to set aside that part of its March 28, 2007, ruling granting summary judgment for Fashion Bug on Kirt's § 1981 claim.

Pursuant to the court's April 16, 2007, order, on May 7, 2007, Kirt filed her Response To Court's April 16, 2007, Order For Reconsideration Of Summary Judgment In Defendant's Favor On Plaintiff's § 1981 Claim (docket no. 22), asking the court to set

11

aside its ruling granting summary judgment in Fashion Bug's favor on her § 1981 claim. On May 21, 2007, Fashion Bug filed a Response To Plaintiff's Brief In Compliance With Court's Order Of April 16, 2007 (docket no. 23), asserting that *Green* does *not* require the court to set aside its prior ruling. Kirt filed a Reply (docket no. 24) on May 25, 2007. Neither party requested oral arguments on reconsideration of the court's summary judgment ruling, and the court did not find such oral arguments to be necessary.

Therefore, the question of whether or not *Green* requires a different result in this case on Kirt's § 1981 claim is now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For Reconsideration

This court has previously found that Rule 54(b) of the Federal Rules of Civil Procedure provides authority for a court to reconsider any interlocutory order, including a prior ruling on a motion for summary judgment. *Doctor John's, Inc. v. City of Sioux City, Iowa*, 467 F. Supp. 2d 925, 931 (N.D. Iowa 2006); *Wells' Dairy, Inc. v. Travelers Indemnity Company of Illinois*, 336 F. Supp. 2d 906, 909 (N.D. Iowa 2004) (citing cases). Specifically, Rule 54(b) provides that, unless the court certifies the order for interlocutory appeal, "any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision *is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties." FED. R. CIV. P. 54(b) (emphasis added). Moreover, this court has repeatedly held that it has the inherent power to reconsider and revise any interlocutory order, such as a summary judgment ruling, up until the time that a final judgment is entered. *Wells' Dairy, Inc.*, 336 F. Supp. 2d at 909

12

(citing *Kaydon Acquisition Corp. v. Custum Mfg., Inc.*, 317 F. Supp. 2d 896, 903 ( N.D. Iowa 2004); *Helm Financial Corp. v. Iowa N. Ry. Co.*, 214 F. Supp. 2d 934, 999 (N.D. Iowa 2002); and *Longstreth v. Copple*, 189 F.R.D. 401, 403 (N.D. Iowa 1999)).

This court has also noted, "The exact standard applicable to the granting of a motion under Rule 54(b) is not clear, though it is typically held to be less exacting than would be [applicable to] a motion under Federal Rule of Civil Procedure 59(e), which is in turn less exacting than the standards enunciated in Federal Rule of Civil Procedure 60(b)." *Id.* Although the standards for reconsideration of interlocutory orders may be less "exacting" than the standards for reconsideration of final orders under Rules 59(e) and 60(b), this court has nevertheless held that it should look to the general principles under Rules 59(e) and 60(b) for guidance when reconsidering a summary judgment ruling pursuant to Rule 54(b). *Id.* (citing *Bragg v. Robertson*, 183 F.R.D. 494, 496 (S.D. W.Va. 1998)). Under Rule 59(e), a judgment may be amended to correct "clearly" or "manifestly" erroneous findings of fact or conclusions of law. *See, e.g., Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988); *Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 919 (N.D. Iowa 2003). It is this standard that the court finds is applicable to reconsideration of a summary judgment ruling under Rule 54(b).

The conclusions of law and findings of fact that the court must reconsider against this "clearly" or "manifestly" erroneous standard in this case are the legal standards for a § 1981 "right to contract" claim by a retail customer against a merchant and the factual question of whether or not Kirt has generated genuine issues of material fact that she could meet the § 1981 standards, thereby avoiding summary judgment. *See* FED. R. CIV. P. 56(e) (the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for

trial." ); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (if a party fails to make
a sufficient showing of an essential element of a claim with respect to which that party has
the burden of proof, then the opposing party is "entitled to a judgment as a matter of
law"); *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997);
*McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v.
Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995); *see generally Bunda v. Potter*, 369 F. Supp.
2d 1039, 1046 (N.D. Iowa 2005) (the judge's function at the summary judgment stage of
the proceedings is not to weigh the evidence and determine the truth of the matter, but to
determine whether there are genuine issues for trial); *Steck v. Francis*, 365 F. Supp. 2d
951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp.
2d 977, 984 (N.D. Iowa  2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954
(N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa
2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson
v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990).

### B.  *The Decision In* Green

The court's order for briefing on reconsideration of its summary judgment ruling
on Kirt's § 1981 claim was prompted by the decision of the Eighth Circuit Court of
Appeals in *Green v. Dillard's, Inc.*, 483 F.3d 533 (8th Cir. 2007), which was filed just
a week after this court's summary judgment ruling.  Thus, the decision in *Green* requires
careful scrutiny.

In *Green*, African-American plaintiffs contended that they were prevented from
closing a purchase by discriminatory conduct of an employee of Dillard's, Inc., who
refused to wait on them and called them "Fucking niggers," but the district court granted

14

summary judgment for Dillard's.  *Green*, 483 F.3d at 534.  The Eighth Circuit Court of
Appeals summarized the facts pertinent to the plaintiffs' § 1981 claim as follows:

> On August 11, 2002, Rodney and Charlan Green went
> to the Dillard's store in the Metro North Mall in Kansas City,
> Missouri to buy a handbag, purse, and watch for Charlan.
> They went directly to the watch counter in the accessories
> section where watches were displayed in a locked display case.
> Although there were two clerks in the section, neither
> approached the Greens who looked at the watches in the glass
> case for about ten minutes while waiting to be helped.  One of
> the clerks was leaning against a wall with her arms folded, and
> Charlan went up to her and asked, "Ma'am, can you help us?"
> The clerk was Linda McCrary, and she said "No" to Charlan
> and continued to stand in the same position.  The Greens
> testified that they were stunned by her response and
> immediately turned to leave the store, but the other clerk in the
> section, Veronica Aguero, yelled, "Ma'am, I'll help you when
> I'm finished here."  Aguero was helping other customers at the
> time so the Greens waited at the purse counter.  Although
> McCrary was still in the accessories department, she made no
> move to help the Greens while they waited.
>
> When Aguero came over to the purse counter to assist
> the Greens, McCrary followed.  She stood by the register with
> her arms crossed and glared at the Greens while they looked
> at the merchandise.  With Aguero's help, Charlan selected a
> purse, a matching wallet, and a key chain to buy.  When she
> saw this, McCrary loudly asked Aguero, "Are they getting all
> that?  How are they paying for it?"  Aguero said nothing in
> response and Rodney wrote a check to Dillard's in the amount
> of $555.62 to pay for the items.   Aguero asked for
> identification, then accepted the check and rang up the sale.
> Throughout this transaction McCrary kept staring at the
> Greens and muttering under her breath.
>
> After his check was accepted, Rodney asked McCrary,
> "Ma'am, there's other people, can you help somebody else?"
> McCrary answered, "I can, but I'm not."   Rodney was

15

offended by McCrary's behavior and asked Aguero to call a manager. After putting their selections in a bag, Aguero asked the Greens if there was anything else they were interested in buying. Charlan said that she would like to purchase a wristwatch. Aguero and Charlan then went to the nearby watch counter.

Rodney stayed behind at the register where the Greens had made their purchases. McCrary also remained there with an "even more intent" hostile expression on her face according to Rodney. An uncomfortable silence followed so he pulled out his identification and credit cards and laid four credit cards on the counter to show McCrary he was a bona fide customer. He told her, "Ma'am I don't have to steal anything. I can buy anything in the store I like. I have four platinum cards here." He added that he was a police officer. McCrary approached the counter on which Rodney had laid his credit cards, looked at the cards, and said, "Platinum. Huh." Then she stepped back and said, "Fucking niggers" and stalked off. Being called "niggers" made Rodney feel as if he had been physically assaulted and treated as less than human. He felt unable to remain in the store or to make any further purchases "after being called the most heinous name in the world."

Meanwhile Charlan and Aguero had returned from the watch counter in order to get the keys for the watch case. They both heard McCrary's epithet. Charlan testified that she felt humiliated and publicly embarrassed by McCrary's words and conduct. Aguero apologized and told the Greens that "she [McCrary] had been disciplined for this before."

It was at this point that a Dillard's sales manager, Amanda Andreasen, arrived. She approached Rodney and asked what was going on. Rodney informed her what had happened and what McCrary had said to them. Andreasen apologized several times and said that Dillard's had "had problems with [McCrary] with this before." While Andreasen and the Greens were talking, Andreasen received a phone call. As she listened to the caller, Andreasen's face colored and tears came to her eyes. After the conversation ended she told

16

the Greens, "That was one of the customers that overheard what was said."

   The Greens testified that they were so upset by the incidents with McCrary that they were unable to complete their intended purchase of the watch. Rodney also told Andreasen they wanted to return the items they had already purchased. Andreasen returned his check and the Greens left the store.

*Green*, 483 F.3d at 534-36.

   In analyzing the sufficiency of the evidence supporting the Greens' § 1981 claim, the Eighth Circuit Court of Appeals first stated, "To establish a prima facie case of discrimination in the retail context, a § 1981 plaintiff must show (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, and (3) interference by the defendant with an activity protected under the statute." *Id.* at 538 (citing *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004)). The court found that there was no dispute that the Greens had satisfied the first element, but, because "Section 1981 'does not provide a general cause of action for race discrimination,'" the court reiterated that "plaintiffs must show they had a protected contractual relationship or interest." *Id.* (quoting *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001)).

   As to the required contractual interest, the court in *Green* explained as follows:

   The addition of § 1981(b) extended the statute's protections "to all phases and incidents of the contractual relationship," *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 302, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994), specifically and precisely including "the making . . . of contracts," and the language of § 1981(a) is itself very broad. *See Denny v. Elizabeth Arden Salons, Inc.,* 456 F.3d 427, 437 (4th Cir. 2006). As the First Circuit has explained, § 1981 reaches "beyond the four corners" of a contract into the contracting process. *Garrett v. Tandy Corp.,* 295 F.3d 94, 100 (1st Cir. 2002). *In the retail context, § 1981 plaintiffs are required to*

17

demonstrate that they actively sought to enter into a contract with the retailer. *Williams v. Staples, Inc.,* 372 F.3d 662, 667-68 (4th Cir. 2004); *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 872 (6th Cir. 2001). *There must have been "some tangible attempt to contract," Morris v. Dillard Dep't Stores, Inc.,* 277 F.3d 743, 752 (5th Cir. 2001), *such as a demonstrated interest in specific items which the defendant has held out for sale. Cf. Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir. 1996) (no evidence that plaintiffs were interested in merchandise). Since the Greens had completed their purchase of the purse, wallet, and key chain, thus making the contract for them, they no longer had an interest in forming a contract as to those items, *see Youngblood,* 266 F.3d at 854-55, but the issue is different in respect to the wristwatch which Charlan wanted to buy. *The contracting process began as she looked at the watches in the display case and selected which one she was interested in. The process then continued as she communicated to Aguero her desire to purchase that watch. Charlan testified that when the Greens entered Dillard's, they had proceeded first to the watch counter where she determined which watch she wanted to buy. When Aguero asked whether there was anything else the Greens wanted after their initial purchases, Charlan replied that she wanted "to get the watch." She asked Aguero to get the key to the display case where the watches were kept, and she and Aguero were on their way to get it when they heard McCrary's racial insult. The Greens thus produced evidence from which a jury could reasonably find that Charlan had selected a specific item to buy and in fact had clearly communicated to Aguero that she intended to purchase it.*

Under § 1981 contract formation begins and the statutory protections are triggered once a customer has made "some tangible attempt to contract" by selecting particular items for sale. *Morris,* 277 F.3d at 752. In a retail setting "[e]ach time a customer takes an item off the shelf, a new contract looms." *Garrett,* 295 F.3d at 100; *see also Christian,* 252 F.3d at 874 (plaintiff had selected items and put them in

18

her shopping cart). Here Charlan was unable to pick up the watch since it was locked in a case, but *the testimony of the Greens would permit a finding that she would have taken possession of it if the ongoing transaction had not been thwarted by McCrary's conduct. It is intent to purchase, not physical possession, that is needed to create a contractual interest. See Denny,* 456 F.3d at 435 (in § 1981 action against beauty salon contractual interest created by customer's telephone conversation with receptionist about buying hair coloring for her mother). *We conclude that there is a genuine issue of fact as to whether the Greens had a contractual interest protected by § 1981, and as to whether they were prevented from making the contract for the watch.*

*Green*, 483 F.3d at 538-39 (emphasis added).

Having found genuine issues of material fact on the issue of establishment of a contractual interest, the court in *Green* turned to the question of whether there had been actionable interference with that interest:

In order to prevail in their § 1981 case the Greens must also show actionable interference with their contractual interest. *Daniels,* 373 F.3d at 887. At oral argument counsel stated that the Greens would have liked to have had an "enjoyable shopping experience," but the "enjoyment" protected by the statute is the "exercise of a right." *See* Black's Law Dictionary 571 (8th ed.2004). The right protected by § 1981 is the right of individuals like the Greens to the same benefits and privileges of contractual relationships as white shoppers. *In this case the Greens have produced evidence that goes beyond bad manners, isolated rudeness, or neglect of a customer. Their evidence includes not only a most egregious racial slur, but also a series of actions which a trier of fact could find as a whole thwarted their attempt to make and close a contract with Dillard's for the wristwatch.*

Here, there is evidence that McCrary explicitly refused service to the Greens when they first approached her,

19

discouraged her coworker from assisting them by questioning their ability to pay, and treated them at all times with pronounced hostility while rejecting Rodney's request to leave them alone. No other employee reproached her or tried to stop her behavior, and the manager requested by Rodney Green did not appear until after McCrary had left the section in a huff. *Although other Dillard's employees were more civil to the Greens, a jury could reasonably find that McCrary's acts of refusing service, interfering with the attempts of another employee to help them, and culminating in a forceful racial insult were enough to thwart the Greens' ability to complete their purchase. McCrary did not merely refuse to serve the Greens personally; she actively hindered Aguero's service as well. Cf. Bagley v. Ameritech Corp.*, 220 F.3d 518, 521 (7th Cir. 2000) (manager personally hostile to black customer but facilitated service from another employee). We conclude there is a genuine issue of fact as to whether the Greens suffered actionable interference with their rights under § 1981.

*Green*, 483 F.3d at 539 (emphasis added).

Having found both a contractual interest and actionable interference with that interest, the court in *Green* turned, at last, to the question of whether the Greens could prove discriminatory intent. The court found that, although direct evidence of discriminatory intent was not required, the Greens had produced such direct evidence by pointing to evidence that McCrary called them "niggers." *Id.* at 540. The remainder of the decision in *Green* is not at issue here, because it considers the standard for liability of a retailer for discriminatory acts of a store employee towards a customer. *See id.* at 540-41.[3]

_____

[3]Again, Fashion Bug asks the court for direction about when it may properly address the issue of vicarious liability, which the court held in its original summary

(continued...)

20

(…continued)

judgment ruling had not been properly asserted, because it was only raised in Fashion Bug's reply brief.  The question of employer liability is not properly before the court on reconsideration of summary judgment, when that issue still has not been properly raised or briefed.  Again, the court notes that the deadline for dispositive motions passed in December 2006 without the issue of employer liability ever being properly raised.

The court notes, however, that the decision in *Green* appears to uphold vicarious liability of an employer for a store employee's actions, in the face of the defendant's argument, in that case, that it could not be held vicariously responsible for the store employee's actions.  *See Green*, 483 F.3d at 540.  The court explained:

> Similar arguments have been rejected elsewhere.  In *Arguello v. Conoco, Inc.*, 207 F.3d 803, 810 (5th Cir. 2000), the Fifth Circuit held under general agency principles that a retailer can be liable under § 1981 for the actions of its nonsupervisory employees when they are acting within the scope of their duties.  *See also Solomon v. Waffle House, Inc.*, 365 F. Supp. 2d 1312, 1328-29 (N.D. Ga. 2004); *Eddy v. Waffle House, Inc.*, 335 F. Supp. 2d 693, 701 (D.S.C. 2004). The significant number of summary judgments denied or final judgments upheld against retailers based on actions of their nonsupervisory employees is also worthy of note.

*Green*, 483 F.3d at 540 (footnote citing summary judgment denials referred to omitted). However, the court then muddied the waters:

> Our court has never had occasion to adopt a liability standard for a retail employer whose employees are alleged to have violated § 1981 because in our past cases the plaintiffs failed to establish a prima facie case.  *See Bilello v. Kum & Go, L.L.C.*, 374 F.3d 656, 660 (8th Cir. 2004); *Daniels*, 373 F.3d at 887; *Bediako*, 354 F.3d at 839; *Youngblood*, 266 F.3d at 854.  In *Daniels* the issue was recognized but not resolved since the plaintiffs had not made a showing of discriminatory treatment.  In a footnote we questioned whether a retailer could be held liable under respondeat superior for the "actions of an unidentified sales clerk," *see Daniels*, 373 F.3d at 888

(continued…)

21

### C. Arguments Of The Parties

#### 1. Kirt's argument for reconsideration

In her initial brief in support of reconsideration of the court's ruling granting Fashion Bug's motion for summary judgment on her § 1981 claim, Kirt argues that, in pertinent part, the decision in *Green* deals with the final element of Kirt's *prima facie* case, whether the discrimination concerned an area enumerated by the statute. Kirt contends that the decision in *Green* is clearly contrary to the notion that the plaintiff cannot meet this element if she never actually attempted to make a purchase. She contends that *Green* states that a customer has a contract interest when she has a demonstrated interest in specific items which the defendant has held out for sale. She contends that she met this requirement, because she had been specifically told that Fashion Bug had pink jeans or pants for sale, and she was very specifically shopping for that one particular item. She points out that the *Green* decision states that it is the intent to purchase, not physical

_____

[3](...continued)

> n. 4, commenting as much about the failure of the plaintiffs to produce evidence as about the unbriefed and unanswered issue of employer liability.

*Green*, 483 F.3d at 540 (footnote explaining the decision in *Daniels* omitted). Although the court concluded that, "[i]n the case before the court the issue of employer liability cannot be deferred," the court did *not* consider whether or not the employer could be vicariously liable for the store employee's conduct; instead, the court considered whether the employer could be "directly liable for harm resulting from his own negligent or reckless conduct." *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 213 & cmts.); *see also id.* at 540-41 (analyzing the record and concluding that a reasonable factfinder could conclude that the employer had acted negligently in keeping the store employee responsible for discriminatory conduct on the floor when the employer had reason to know that the employee's hostile propensities could lead to incidents like the one experienced by the plaintiffs and that the employer's inaction contributed to the incident).

22

possession, that is needed to create a contractual interest. Kirt argues that there is no dispute that she intended to purchase pink jeans, so that her failure to tell the clerks that was what she was seeking or to make any actual attempt to purchase such an item is not fatal to her claim.

Kirt argues, further, that the facts in her case are comparable to the facts in *Green*, because much as in *Green*, one clerk discouraged her co-worker from assisting the plaintiff by accusing her of shoplifting and treated the plaintiff at all times with pronounced hostility while rejecting the plaintiff's request to leave her alone. She also argues that *Green* is contrary to this court's conclusion that, where the record shows beyond dispute that a customer could, and knew that she could, complete any desired transaction, notwithstanding a store employee's discriminatory conduct, there has been no interference with the customer's right to make a contract within the meaning of § 1981. This is so, she contends, because the court in *Green* held that, where one store employee called the customers racially derogatory names, but another store employee helped the customers to complete several transactions until the customers abandoned their plans to make a final purchase, the customers were found to have a cause of action.

Thus, Kirt contends that, in light of *Green*, she has demonstrated an actionable interference with her right to make and enforce contracts in violation of § 1981. Consequently, she asks the court to set aside its ruling granting summary judgment in Fashion Bug's favor on her § 1981 claim.

### 2. *Fashion Bug's response*

Fashion Bug counters that *Green* reiterates that § 1981 does not provide a "general cause of action for race discrimination," but, instead, requires a § 1981 plaintiff to demonstrate that he or she actively sought to enter into a contract with the retailer.

23

Fashion Bug argues that, in this case, Kirt has not raised a genuine issue of material fact that she actively sought to enter into a contract with Fashion Bug.

More specifically, Fashion Bug argues that *Green* reiterated that a § 1981 plaintiff must show that he or she actively sought to enter into a contract with the retailer, which requires that there must have been some tangible attempt to contract and a demonstrated interest in specific items that the defendant has for sale, not just a secret or unexpressed interest in some particular item that might be carried in the store. Here, Fashion Bug asserts that Kirt has not made any showing that she actively sought to enter into a contract with Fashion Bug, made any tangible attempt to contract, or demonstrated an interest in any specific item that the defendant had held out for sale, where Kirt kept to herself her purported intention to purchase pink jeans. Fashion Bug argues that Kirt kept her intention to herself, despite knowing that Beaudette would help her purchase anything that she wanted, reasoning that Kirt has thereby admitted that she did not really want anything. At most, Fashion Bug asserts that Kirt has shown only a speculative or prospective contract interest, not an actual interest, so that the court correctly granted summary judgment on Kirt's § 1981 claim.

Moreover, Fashion Bug argues that the decision in *Green* demonstrates that this court correctly determined that there had been no actionable interference with Kirt's ability to buy pink jeans or any other items. While the plaintiffs in *Green* could show actionable interference, Fashion Bug argues that the decision in their case did not hold that interference with the right to contract under § 1981 can be read so broadly as to prohibit any interference, of any kind, at any point in the shopping process, as an interference with the right to make a contract. Indeed, Fashion Bug argues that the decision in *Green* rejected the contention of the plaintiffs in that case that § 1981 protects an enjoyable shopping experience, holding instead that § 1981 protects only the exercise of a right to

contract. Fashion Bug argues that the plaintiffs in *Green* had sufficiently demonstrated a desire to purchase a watch, had presented sufficient evidence that a reasonable factfinder could conclude that their desire had been thwarted by racially discriminatory conduct of a clerk, including an egregious racial slur, and had shown that no other employee reproached the offending clerk or tried to stop her behavior. Here, on the other hand, Fashion Bug contends that Kirt has made no such showing, because any reference to the plaintiff's race was only inferential, and Fashion Bug's manager made a sincere apology and urged the plaintiff to continue shopping after intervening to stop Anderson's tirade.[4]

### 3. *Kirt's reply*

In reply, Kirt argues that Fashion Bug improperly construes *Green* to turn on the extremely offensive conduct of one of the defendant's clerks, while asserting that the conduct at issue in this case is far less offensive. Kirt argues, however, that the decision in *Green* was not based in any way on the degree of offensiveness of the conduct, but on the interference with the plaintiff's right to contract. If this court reads *Green* to require consideration of the degree of offensiveness of the defendant's conduct, in determining whether or not there has been actionable interference, Kirt contends that the determination of how offensive the conduct was is a fact question to be determined by a jury at trial, not by the court on summary judgment. Kirt adds that, like the plaintiffs in *Green*, she has pointed to evidence of a racial slur and a series of actions that a trier of fact could find as a whole thwarted her attempt to make and close a contract.

---

[4]Fashion Bug also asks the court for direction about when it may properly address the issue of vicarious liability, which the court held in its original summary judgment ruling had not been properly asserted, because it was only raised in Fashion Bug's reply brief. The court notes that the deadline for dispositive motions passed in December 2006, so that Fashion Bug has missed its opportunity to challenge vicarious liability pre-trial.

Case 5:05-cv-04142-MWB    Document 26    Filed 07/10/07    Page 25 of 34

### D.  Application Of Green

##### 1.    Elements of the prima facie case in dispute

The decision in *Green* reaffirmed the elements of a *prima facie* case of § 1981 race discrimination that this court had applied in its original summary judgment ruling. *Compare Kirt*, 479 F. Supp. 2d at 948 (to establish a *prima facie* claim of racial discrimination under § 1981, Kirt was required to show the following:  (1) that she is a member of a racial minority, (2) that the defendant intended to discriminate against her on the basis of race, and (3) that the discrimination concerned an area enumerated by the statute, in this case, Kirt's "right to contract."), *with Green*, 483 F.3d at 538 ("To establish a prima facie case of discrimination in the retail context, a § 1981 plaintiff must show (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, and (3) interference by the defendant with an activity protected under the statute.").  As in *Green*, there is no dispute that Kirt satisfies the first element, because she is an African-American female.  *See Green*, 483 F.3d at 538 ("There is no dispute that the Greens are members of a protected class and that the first factor of the prima facie test is satisfied.").  Nor is there now a dispute that a reasonable factfinder could conclude that Anderson intended to discriminate against Kirt by making the challenged comments, as required by the second element of Kirt's *prima facie* case, because Fashion Bug now states that "this court has convinced the undersigned counsel that the 'you people' comment allegedly made by Missy Anderson, Fashion Bug's clerk, could be construed by a jury as demonstrating a racial animus."  Defendant's Response To Plaintiff's Brief In Compliance With Court's Order Of April 16, 2007 (docket no. 23), 7.[5]  Thus, upon reconsideration

---

[5]Presumably, Fashion Bug does continue to dispute whether *the company* had any intent to discriminate against Kirt.

in light of *Green*, the question is whether or not Kirt can generate genuine issues of material fact on the "interference" element of her *prima facie* case.

## 2.    *Interference with a contractual right*

Fashion Bug is correct that, in *Green*, the court considered the "interference" element of the plaintiffs' *prima facie* case to involve two separate inquiries:  (1) whether the plaintiffs had shown a protected contractual relationship or interest, *see Green*, 483 F.3d at 538-39, and (2) whether the plaintiffs had shown actionable interference with their contractual interest, *see id.* at 539.   The court will consider these two prongs of the "interference" element in this case in turn.

### a.    *Contractual relationship or interest*

As the court explained in *Green*, "[t]he addition of § 1981(b) extended the statute's protections to all phases and incidents of the contractual relationship, specifically and precisely including 'the making . . . of contracts,' and the language of § 1981(a) is itself very broad."   *Green*, 483 F.3d at 538 (internal quotation marks and citations omitted). Nevertheless, the court held that, "[i]n the retail context, § 1981 plaintiffs are required to demonstrate that they *actively sought* to enter into a contract with the retailer."   *Id.* (emphasis added).   More specifically, "there must have been *some tangible attempt to contract*, such as *a demonstrated interest* in specific items which the defendant has held out for sale."   *Id.* (emphasis added; internal quotation marks and citations omitted).   In *Green*, the court found that these requirements were satisfied, where the plaintiffs looked at specific items in a display case and selected the one that they wanted, communicated their desire to purchase the specific item to a store clerk, and were on their way with the clerk to get the item from the display case when they heard the other clerk use a racial insult.   *Id.*   In short, the court held, "The Greens thus produced evidence from which a jury could reasonably find that Charlan had selected the specific item to buy and in fact

27

had clearly communicated to [the store clerk] that she intended to purchase it." *Id.* at 539. The court found it immaterial that the customer had been unable to take the item off the shelf, which would have plainly made "a new contract loom[ ]," where the testimony of the customer would permit a finding that she "would have taken possession of it if the ongoing transaction had not been thwarted by [the other clerk's] conduct." *Id.*

Here, in contrast, there is no evidence that Kirt had selected a specific item to buy from the store's inventory; she was, at best, *looking for* a specific item, pink jeans, but had not selected any such item. *Compare id.* at 538 (the plaintiff had looked at specific items in a display case and selected the one that they wanted). Moreover, Kirt *never* communicated any interest in any item—not even by a general description of something she was looking for—to either Anderson or Beaudette. *Compare id.* at 539 (the plaintiffs communicated their desire to purchase a specific item to the clerk). Thus, unlike the situation in *Green*, the undisputed evidence in this case does not give rise to any inference at all that Kirt "actively sought to enter into a contract with the retailer" to buy pink jeans or any other specific item, because there was no "tangible attempt to contract" or "demonstrated interest in specific items which the defendant has held out for sale." *Id.* at 538. Finally, although "a new contract looms" each time a customer takes an item off the shelf, Kirt neither picked up any particular item, nor asked a clerk to help her take possession of a particular item from a closed display case or stock displayed out of customers' reach. *Compare id.* at 539 (the plaintiff was unable to pick up the watch that she wanted, because it was in a locked display case, but the evidence was sufficient to permit a finding that she would have taken possession of it, having asked the clerk to open the case, had the transaction not been thwarted by the discriminatory conduct of another clerk). In short, there was no "ongoing transaction" that was thwarted in this case,

28

because there is no evidence that any new contract ever "loomed" from Kirt's conduct. *Id.* at 538-39.

Kirt, nevertheless, argues that it was her intent to purchase pink jeans, not physical possession of such an item, that created a contractual interest. In *Green*, the court did observe, "It is intent to purchase, not physical possession, that is needed to create a contractual interest." *Id.* at 539. However, this observation was made in the context of evidence that the plaintiff intended to and *would have* taken physical possession of a selected item—*i.e.*, evidence that the plaintiff had taken active steps to obtain the item with a clerk's assistance—"if the ongoing transaction had not been thwarted by [another clerk's] conduct." *Id.* *Green* does not stand for the proposition that a customer's secret or unexpressed intent to purchase some item creates the necessary contractual interest.

As before, the court concludes that, even in light of the subsequent decision in *Green*, Kirt's secret intent to purchase pink jeans does not give rise to a contractual interest protected by § 1981, and she has pointed to nothing else sufficient to give rise to such an interest.

### b. *Actionable interference with the contractual interest*

Even assuming that Kirt had generated genuine issues of material fact that she had a protectable contractual interest, "[i]n order to prevail on [her] § 1981 case [Kirt] must also show actionable interference with [her] contractual interest." *Green*, 483 F.3d at 539. In its original summary judgment ruling, this court concluded that the "make or enforce contracts" provision of § 1981 could not be read so broadly as to prohibit any interference, of any kind, at any point in the "shopping" process as an interference with the right to "make" a contract. *Kirt*, 479 F. Supp. 2d at 955, and also noted that the Eighth Circuit Court of Appeals had expressly stated that § 1981 "'does not provide a general cause of action for race discrimination.'" *Id.* at 947 & 956 (quoting *Youngblood*, 266 F.2d at 855).

29

In *Green*, the Eighth Circuit Court of Appeals likewise reaffirmed the latter proposition, *see Green*, 483 F.3d at 538 (also quoting *Youngblood*), and acknowledged the former proposition by rejecting the plaintiffs' contention that interference with an "enjoyable shopping experience" would be enough to violate § 1981. *Id*. at 539.

What *is* protected by § 1981 "is the right of individuals like the Greens [or Kirt] to the same benefits and privileges of contractual relationships as white shoppers." *Id*. In *Green*, the court found that the plaintiffs had "produced evidence that goes beyond bad manners, isolated rudeness, or neglect of a customer," and instead, included evidence "not only [of] a most egregious racial slur, but also a series of actions which a trier of fact could find as a whole thwarted their attempt to make and close a contract with Dillard's for the wristwatch." *Id*. The court noted that one clerk, McCrary, had refused service to the Greens, discouraged her coworker from assisting them by questioning their ability to pay, and treated them with hostility, and also noted that "no other employee reproached her or tried to stop her behavior." *Id*. Specifically, "[a]lthough other Dillard's employees were more civil to the Greens, a jury could reasonably find that McCrary's acts of refusing service, interfering with the attempts of another employee to help them, and culminating in a forceful racial insult were enough to thwart the Greens' ability to complete their purchase," where the offending employee not only refused to serve the Greens personally, but actively hindered another clerk from serving them as well. *Id*. In so holding, the court in *Green* distinguished the circumstances from those presented in *Bagley v. Ameritech Corp.*, 220 F.3d 518, 521 (7th Cir. 2000), on which this court had originally relied, on the basis that in *Bagley*, a manager who was personally hostile to a black customer nevertheless facilitated service from another employee. *See Green*, 483 F.3d at 539 (citing *Bagley*).

30

Here, the circumstances are undisputably more like those presented in *Bagley* than in *Green*. Kirt is correct that Anderson's comments went beyond bad manners, isolated rudeness, or neglect of a customer, but they did not, as a matter of law, constitute a series of actions that, as a whole, would have thwarted an attempt to make and close a contract for purchase of a particular item, if there had been any attempt to make and close such a contract. *Cf. id.* A critical difference between this case and *Green* is that another employee, Beaudette, *did* reproach Anderson and tried to stop—and, indeed, did stop—her behavior. *Compare id.* ("No other employee reproached [the offending employee] or tried to stop her behavior."). Unlike *Green*, in which the manager requested by the Greens did not appear until after the offending employee had left the section in a huff, *id.*, Beaudette, the store manager, appeared in the middle of Anderson's tirade, put a stop to it, then did everything she could reasonably have been expected to do to make clear that Kirt could complete any purchase she desired. In fact, Beaudette did more than that: As the court noted in its original ruling, on the undisputed record, Beaudette not only stopped Anderson's conduct, invited Kirt to finish her shopping, and offered to help Kirt with whatever she needed, but provided Kirt with all of the information necessary to make a complaint about Anderson's conduct over Beaudette's head to company representatives. Nor is there any dispute that Kirt understood the sincerity of Beaudette's offer, because she believed that Beaudette had been "really nice." Thus, as in *Bagley*, notwithstanding discriminatory conduct by one store employee, there is no dispute that another store employee facilitated service to Kirt. *See Bagley*, 220 F.3d at 521.

As the court previously held, under these undisputed circumstances, it is plain that Kirt terminated the opportunity to enter into a contract or purchase of goods by leaving the store. *Cf. id.* (the plaintiff had no § 1981 claim, because the plaintiff "cut off his exchange—and thus the opportunity to buy the phone—by leaving the store"). Even

Case 5:05-cv-04142-MWB   Document 26   Filed 07/10/07   Page 31 of 34

though such a reaction to the discriminatory conduct by Anderson was entirely understandable, Kirt's hurt feelings and emotional upset resulting from discriminatory conduct, which prompted her to abandon her shopping, do not establish that the discriminatory conduct actually interfered with her § 1981 right to contract.

To put it another way, even though the court in *Green* found that there were genuine issues of material fact as to actionable interference with contractual rights, where one store employee assisted the plaintiffs after discriminatory conduct by another store employee, *Green* does not stand for the proposition that intervention of other employees is irrelevant to whether there has been actionable interference. The question in *Green* was the nature of the conduct of the non-discriminating store employee. Specifically, the court in *Green* distinguished between the failure of other employees to reproach or to try to stop the offending employee in that case with the facilitation of service from another employee despite the conduct of an offending employee in *Bagley*. *See Green*, 483 F.3d at 539. Thus, even after *Green*, as this court observed in its original ruling, an employer can "reopen the door" to a customer to make a contract after discriminatory conduct by an employee by making clear that the employer is willing to enter into a transaction with the offended customer. *Cf. Bagley*, 220 F.3d at 521-22 (another sales clerk's offer to help the plaintiff make a purchase upon his return later in the day "definitively establishes that [the store] would have sold [the plaintiff] a phone," and thus, the store had not interfered with the plaintiff's right to contract, where the plaintiff terminated the transaction).

Finally, Kirt asserts that Fashion Bug has improperly read *Green* to allow consideration of the offensiveness of the conduct as part of the calculus of whether the conduct actually interfered with the plaintiff's right to contract. This court does not entirely agree with Kirt's reading of *Green*. In *Green*, in considering whether the plaintiffs had shown actionable interference with their contractual interest, the court plainly

32

contrasted conduct that was merely "bad manners, isolated rudeness, or neglect of a customer" with evidence that the offending employee's conduct included "not only a most egregious racial slur, but also a series of actions which a trier of fact could find as a whole thwarted their attempt to make and close a contract with Dillard's for the wristwatch." *Green*, 483 F.3d at 539. Thus, the degree of offensiveness of the conduct was relevant to how obstructive it was. It is absurd to pretend that more offensive conduct is not more likely to effect actionable interference with contractual interests than less offensive conduct, just as more offensive conduct is more likely to give rise to an inference of discriminatory intent than less offensive conduct. *See id.* at 540 (finding that calling customers "niggers" was direct evidence of discrimination). The conduct at issue here, while certainly offensive, is only circumstantial evidence of discriminatory intent, because one must infer a reference to African-Americans from the use of "you people," and even carrying such an inference, the comment at issue here is milder and less obstructive in its effect than the "direct" evidence of discrimination and obstructive impact in *Green* of calling customers "niggers."

Under the standards enunciated in *Green*, Kirt cannot generate genuine issues of material fact on the "interference" prong of the "interference with contractual rights" element of her *prima facie* case of race discrimination in violation of the right-to-contract provision of § 1981.

### 3. *Summary*

Upon reconsideration in light of *Green*, the court concludes that Kirt still cannot generate a genuine issue of material fact on the "interference with contractual rights" element of her *prima facie* case of race discrimination in violation of the right-to-contract provision of § 1981. Because she cannot do so, Fashion Bug is entitled to summary judgment on Kirt's § 1981 claim. *Celotex Corp.*, 477 U.S. at 323-24 (if a party fails to

33

make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law"). Thus, the court did not "clearly" or "manifestly" err in either its findings of fact or conclusions of law in granting summary judgment on that claim. *See, e.g., Hagerman*, 839 F.2d at 414 (stating this standard for reconsideration under Rule 59(e), which this court finds applicable to reconsideration of an interlocutory summary judgment ruling under Rule 54(b)); *Baker*, 266 F. Supp. 2d at 919 (same).

### III. CONCLUSION

Despite affording Kirt the opportunity for reconsideration of the order granting summary judgment to Fashion Bug on her § 1981 claim in light of *Green*, the court finds that Kirt has not generated the necessary genuine issues of material fact that would allow her § 1981 claim to go to a jury.

THEREFORE, the court **reaffirms** that part of its March 28, 2007, order granting summary judgment to Fashion Bug on Kirt's § 1981 right-to-contract claim.

**IT IS SO ORDERED.**

**DATED** this 10th day of July, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

Case 5:05-cv-04142-MWB   Document 26   Filed 07/10/07   Page 34 of 34